891 N.E.2d 60 (2008)
In re The ADOPTION OF N.J.G., minor child,
Erikka Gillis, Appellant,
v.
Carla Jackson and John Jackson, Appellees-Petitioners.
No. 09A02-0801-CV-41.
Court of Appeals of Indiana.
July 25, 2008.
*62 Courtney B. Justice, Justice Law Offices, Logansport, IN, Attorney for Appellant.
Douglas A. Cox, Logansport, IN, Attorney for Appellees.

OPINION
BAKER, Chief Judge.
Appellant Erikka Gillis appeals the trial court's order denying her motion to withdraw her consent to the adoption of her child, N.J.G., by appellees-petitioners Carla Jackson and John Jackson. Erikka argues that the evidence in the record does not support the trial court's conclusion that she consented to the adoption of N.J.G. in a way that complies with the relevant statute. Finding that Erikka's consent was not valid because it was given before the child was born and did not follow the execution requirements of Indiana Code section 31-19-9-2, we reverse and remand for further proceedings.

FACTS
In February 2007, Erikka was pregnant with N.J.G.[1] On February 8, 2007, Erikka and the Jacksonswho are Erikka's aunt and uncleentered into an agreement pursuant to which the Jacksons indicated their desire to adopt N.J.G. in exchange for approximately $2,600 to cover some of Erikka's debts and car insurance, $276 a month for the duration of the pregnancy, and a vehicle. The funds and the car were styled as a loan, but the contract stated that if the adoption went through successfully, the Jacksons would forgive the debt. Appellant's App. p. 38-40.
On May 7, 2007, Erikka went to the office of the Jacksons' attorney, id. at 35, and signed an undated, non-notarized "Consent to Adoption Proceedings," which indicated Erikka's consent to the adoption of N.J.G. by the Jacksons, id. at 11.
On May 10, 2007, N.J.G. was born. The same day, the Jacksonsunbeknownst to Erikkafiled a petition to adopt N.J.G. and a petition for temporary custody of the infant. The trial court granted the custody petition on the same day. On May 11, 2007, Erikka signed a Discharge Authorization, which authorized the hospital in which N.J.G. was born to discharge the infant to the care of the Jacksons. Id. at 19. Erikka also signed a document giving the Jacksons authority to make decisions about N.J.G.'s healthcare. Finally, she signed a document giving the Jacksons the right to spend time with and care for N.J.G. while he was still in the hospital, but that document explicitly stated that "[t]his Authorization is not a consent to adoption. I understand that I will sign, if I have not already signed, a separate consent to the adoption of the baby." Id. at 21. Erikka was discharged from the hospital, leaving N.J.G. in the Jacksons' care.
On May 22, 2007, Erikka filed a letter with the court, explaining that she had changed her mind:

*63 The reason I have changed my mind about the adoption is that every second of the day I miss my son. It is something I can't explain, my heart aches for him. I just want him in my arms. I want to be the one who sees his first time for everything. I want to be the one who drops him off for his first day of school. And I want to be the one who cries because I know my little boy is growing up, not someone else.
When I was pregnant I thought I was doing the right thing by letting my Aunt adopt him but I was so wrong. I just want my little boy back in my arms where he belongs, with his mommy.
Id. at 22. On May 29, 2007, the Jacksons' attorney filed a second letter with the court, purportedly written by Erikka. On June 1, 2007, Erikka filed a similar letter, though there are several differences between the documents. Erikka testified that Carla actually drafted the letter. Nov. 8 Tr. p. 76. The June 1 letter that was filed by Erikka informed the court that Erikka had changed her mind again:
... I have been thinking a lot lately and I have decided that to take [N.J.G.] back from my Aunt and Uncle would be the wrong thing to do.
I was afraid that if I let the adoption go through, I would never see him again or know anything about his growing up. But I talked with my Aunt and Uncle and they reminded me that this adoption is open and that I have the right to see him when I want to.... It is a very confusing thing to give up my baby and I was just really emotional about it. I have had time to calm down and think about how it wouldn't be right to take him back....
Appellant's App. p. 24.
On July 26, 2007, the trial court held a hearing at which Erikka appeared and objected to the adoption:
I don't want the adoption to go through. I don't want to hurt my aunt and my uncle but I can't let it go through.... I just really want [N.J.G.] back home with me.... I can't let this go through. I can't....
* * *
I just can't do this. I can't let it go through. Everything I've signed I'll, I'll pay them the money back that they, as I agreed to if it didn't go through, but I have to have my son back. I can't do this.
July 26 Tr. p. 10. The trial court set a hearing on the adoption and Erikka's objections thereto for September 6, 2007. On August 29, 2007, the trial judgethe Honorable Leo T. Burnsrecused himself and on September 18, 2007, the Honorable Thomas Lett was selected to preside over the proceedings herein.
On September 5, 2007, Erikka filed a petition for sole custody of N.J.G. and to dismiss the adoption proceedings. Attached to the petition was an affidavit signed by Erikka that explained, among other things, what had occurred on May 7:
2. On May 7, 2007, I went to [the Jacksons' attorney's] office and signed the attached Consent to Adoption Proceedings....
3. At the time of my signature, May 7, 2007, my baby boy, [N.J.G.], was still in my womb.
4. I was not asked to date the Consent to Adoption Proceedings, or to sign in the presence of a notary public, the Court, a county office of family and children or a licensed child placing agency.
Appellant's App. p. 35.
On November 8, 2007, the trial court held a hearing on Erikka's petition. Erikka, Carla, and John, among others, testified *64 at the hearing. The trial court denied Erikka's petition on November 27, 2007, finding as follows:
1. [Erikka] is the natural mother of [N.J.G.], born May 10, 2007.
2. [The Jacksons] are the adoptive parents of [N.J.G.]
3. On May 7, 2007, [Erikka] executed Consent to Adoption Proceedings.
4. I.C. XX-XX-X-X(b) provides that a child's mother may not execute a consent to adoption before the birth of the child.
5. Subsequent to the birth of [N.J.G.], on May 12, 2007, [Erikka] executed an Adoption Discharge Authorization which included a consent to the adoption. (Petitioner[']s exhibit #3).
6. Again on May 28, 2007, Erikka sent a letter to Judge Burns requesting the adoption to "go through". (Petitioner's exhibit #6).
7. The court finds that Petitioner's exhibit 3 and Petitioner's exhibit 6 constitute valid consent to the adoption, which was freely and voluntarily given, which cannot now be revoked.
8. The court finds that the Natural Mother's request to withdraw consent should be, and is, hereby, Denied.
Id. at 5. At Erikka's request, the trial court stayed the adoption proceedings and certified its order for interlocutory appeal, over which we agreed to accept jurisdiction. Erikka now appeals.

DISCUSSION AND DECISION
Where, as here, the trial court sua sponte enters findings of fact and conclusions, our standard of review is well settled:
[W]e review [the trial court's] findings and conclusions to determine whether the evidence supports the findings, and whether the findings support the judgment. Fowler v. Perry, 830 N.E.2d 97, 102 (Ind.Ct.App.2005). We will set aside the trial court's findings and conclusions only if they are clearly erroneous. Id. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake was made. Id. We neither reweigh the evidence nor assess the witnesses' credibility, and consider only the evidence most favorable to the judgment. Id. Further, "findings made sua sponte control only ... the issues they cover and a general judgment will control as to the issues upon which there are no findings. A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence." Id.

Helm v. Helm, 873 N.E.2d 83, 87 (Ind.Ct. App.2007).
As a general rule, a petition to adopt a child who was born out of wedlock may be granted only if the child's mother executes a written consent. Ind.Code § 31-19-9-1(a)(2). Indiana Code section 31-19-9-2 sets forth the requirements that must be met for such a consent to be effective:
(a) The consent to adoption may be executed at any time after the birth of the child either in the presence of:
(1) the court;
(2) a notary public or other person authorized to take acknowledgments; or
(3) an authorized agent of:
(A) the department;
(B) a county office of family and children; or
(C) a licensed child placing agency.

*65 (b) The child's mother may not execute a consent to adoption before the birth of the child.
I.C. §§ 31-19-9-2(a), -2(b).
In 2005, the legislature amended the consent statute, adding the language in subsection 2(b). Prior to that time, the relevant subsection stated that "`[a] consent to adoption may be executed at any time after the birth of the child [in the presence of named parties].'" Matter of Adoption of H.M.G., 606 N.E.2d 874, 875 (Ind.Ct.App.1993) (quoting Indiana Code section 31-3-1-6(b), the consent statute in effect at that time). After analyzing the statute, a panel of this court found as follows:
We find the intent of the statute, which is designed to provide an equitable adoption procedure by protecting the rights of the adoptive parents and the child as well as those of the biological parents, is best served by finding the consent voidable. A voidable consent is ratified by subsequent action. In the case of a pre-birth consent, such consent is ratified by a post-birth act which sufficiently manifests a present intention to give the child up for adoption.
606 N.E.2d at 875 (footnote omitted).
The appellees rely on H.M.G. to support their argument that the May 7, 2007, "Consent to Adoption Proceedings," appellant's app. p. 11, which was signed by Erikka prior to N.J.G.'s birth, was voidable rather than void. They then direct our attention to certain documents that she signed and actions that she took after her son was born, arguing that those documents and actions sufficiently manifested her intent to give the child up for adoption such that the pre-birth consent was ratified.
We cannot agree. When the legislature amended the relevant statute in 2005, it explicitly provided that "[t]he child's mother may not execute a consent to adoption before the birth of the child." I.C. § 31-19-9-2(b) (emphasis added). This new language indicates a clear legislative intent that pre-birth consents to adoption are void, rather than voidable. Thus, the May 7, 2007, consent is void because it was executed before the birth of N.J.G.[2]
We must consider, therefore, whether any of the documents in the record that were signed after N.J.G.'s birth meet the requirements of Indiana Code section 31-19-9-2(a). The first group of documents were signed by Erikka shortly after N.J.G.'s birth, while both were still in the hospital. A Discharge Authorization authorized the hospital to discharge N.J.G. to the Jackson's care pursuant to the trial court's order awarding temporary custody to the Jacksons:
The undersigned, birth mother of the infant identified above, authorize(s) and direct(s) [the hospital] to discharge the infant to the custody of the above identified person(s). The undersigned represent(s) that this decision is being made as a free and voluntary act after careful deliberation, and that the signing of this authorization is not being done under compulsion, duress or undue influence....
Appellant's App. p. 19. The remainder of the document releases the hospital from liability for discharging N.J.G. to the Jacksons' *66 careand, indeed, it is evidence that the purpose of all of the hospital documents is to shield the hospital from liability. These documents were simply not intended to be judicially binding consents to N.J.G.'s adoption. Thus, the Discharge Authorization is not a consent to N.J.G.'s adoption; instead, it is what it claims to bea consent that the infant be discharged to the care of the Jacksons based on the temporary custody order. Furthermore, it was not executed in the presence of a court, notary public, a representative of the department of family and children, or a licensed child placing agency. Thus, this document does not constitute a consent to N.J.G.'s adoption.
The next hospital document is untitled, but the import of the document is to delegate authority to the Jacksons to make decisions about N.J.G.'s healthcare. The document includes the following statements:
2. I have given my written consent to adoption on 5-9-07.
3. I understand that within the next day or so, the [trial court] will issue an order granting the prospective adoptive parents custody of the Child.
4. ... [B]etween now and the time that the court issues an order granting the prospective adoptive parents custody of the Child, I hereby delegate authority to John R. Jackson to make all decisions and to obtain necessary "health care" ... on behalf of the Child.
Id. at 20. The remainder of the document releases the hospital from liability arising out of the healthcare authorization. The document refers to the "consent," which we have already found to be void, that Erikka executed before N.J.G.'s birth, but does not, in and of itself, constitute a post-birth consent to the adoption. Furthermore, it was not executed in the presence of a court, notary public, a representative of the department of family and children, or a licensed child placing agency. Thus, this document does not constitute a consent to the adoption.
The final hospital document is also untitled, but its import is to authorize the Jacksons to have contact with N.J.G. "including the opportunity to feed, change, hold, and generally care for the baby while the baby is still in the hospital." Id. at 21. This document explicitly states that "[t]his Authorization is not a consent to adoption. I understand that I will sign, if I have not already signed, a separate consent to the adoption of the baby." Id. Clearly, therefore, this document cannot be considered a consent to N.J.G.'s adoption.
The only other document in the record that could possibly be considered a consent to N.J.G.'s adoption is the letter filed by Erikka on June 1, 2007, in which she asks that the adoption "go through[.]" Id. at 24. Initially, we note that Erikka testified that Carla drafted this letter and that Erikka agreed to sign it only because Carla had threatened to ensure that Erikka's three-year-old child would be taken away if she refused to agree to the adoption. Nov. 8 Tr. p. 76. Carla conceded that she "helped" Erikka to write the letter but denied writing the entire letter on her own. Id. at 56. And Carla denied threatening to have Erikka's other son removed from her care, though Carla acknowledged that when Erikka told her "that she had consulted an Indianapolis attorney who advised her if she pursued [the dismissal of the adoption proceedings that] the custody of her current child would be at risk as well," Carla agreed that Erikka would be risking custody of her other child by continuing to fight the adoption. Id. at 63. Resolving the issue of the circumstances underlying the creation *67 of this letter would require us to assess witness credibility, a practice in which we may not engage on appeal. In any event, however, the document was not executed in the presence of the court, a notary public, a representative of the department of family and children, or a licensed child placing agency. Consequently, it does not comply with Indiana Code section 31-19-9-2(a) and does not constitute a valid consent.
As a matter of law, therefore, we find that Erikka has never consented to N.J.G.'s adoption. Thus, to the extent that the trial court's order concludes that Erikka consented to and may not contest N.J.G.'s adoption, we reverse.[3] This holding does not terminate the adoption proceedings, however, inasmuch as under certain circumstances, the biological mother's consent may not be required for the adoption to occur. See I.C. § 31-19-9-8.
The judgment of the trial court is reversed and remanded for further proceedings.
MATHIAS, J., and BROWN, J., concur.
NOTES
[1] The record does not indicate the identity of N.J.G.'s father, and a search of the putative father registry revealed that no putative father has registered. Appellant's App. p. 47.
[2] In any event, we also note that the consent did not abide by Indiana Code section 31-19-9-2(a), which requires that the consent be executed in the presence of the court, a notary public, or an authorized agent of the state department of family and children, a county office of family and children, or a licensed child placing agency. Therefore, the pre-birth consent was invalid for this reason as well.
[3] Inasmuch as we resolve the case in this way, we need not address Erikka's argument that the initial agreement between Erikka and the Jacksons violates public policy. We note, however, that we are extraordinarily troubled by the parties' arrangement, pursuant to which the Jacksons "loaned" Erikka approximately $2600 to cover certain debts and expenses and provided her with a vehicle but agreed to forgive the loan if the adoption was successful. At the worst, this contract veers uncomfortably close to an agreement to buy Erikka's baby and, at the least, it exerted financial pressure on a single mother with limited means to give her baby up for adoption to avoid what would be a nearly crushing debt. Though we leave for another day whether such a contract is void pursuant to public policy, we feel compelled to note that we do not countenance this arrangement.