In the Matter of the ADOPTION OF A.S., D.S., C.S., & J.S., minor children,

By Next Friend, M.L.S.

No. 49A02–0901–CV–60.

Court of Appeals of Indiana.

Sept. 8, 2009.

Janice E. Smith, Indianapolis, IN, Attorney for Appellant.

Karen Bullington, Marion Co. Dept. of Child Services, Indianapolis, IN, Attorney for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

M.L.S. appeals the probate court's ruling denying her petition to adopt minor children A.S., D.S., C.S., and J.S. (collectively, "the Children") and granting the petition to adopt the Children filed by cross-petitioners V.S. and L.S. The probate court judge who heard evidence and argument in the adoption case passed away before issuing a final ruling. Although the parties in such a situation are generally entitled to a new trial, M.L.S. waived her objection to the replacement judge's authority to issue a final ruling in this case. After the biological parents and the Marion County Department of Child Services ("MCDCS") had executed consents allowing M.L.S. to adopt the Children, one of M.L.S.'s adopted children who lived in the home was alleged to be a

juvenile delinquent for committing three counts of child molesting. MCDCS removed the Children and placed them in the home of V.S. and L.S. MCDCS and the Children's biological parents subsequently executed consents allowing V.S. and L.S. to adopt the Children. We conclude that there is no basis under the statutes governing adoption or public policy to prohibit the execution of subsequent consents. Finally, we conclude that the evidence in this case supports the adoption decree in favor of V.S. and L.S. We affirm.

### Facts and Procedural History

S.S. ("biological mother") is the biological mother of the Children. The Children, who currently range in age from thirteen to three years old, have three different fathers. The parental rights of A.S.'s father, K.B., were terminated in 2003. B.S. is the father of D.S. and C.S. H.S. is the father of J.S.

The Children were removed from biological mother's care and made wards of MCDCS because several of them tested positive for cocaine at birth. MCDCS initially placed the Children with a foster mother, M.L.S.[1] M.L.S. had previously adopted three teenage children, two girls and one boy, whose name is Da.S. These three children live with M.L.S. Biological mother and the Children's biological fathers (with the exception of A.S.'s father, whose rights had been terminated) signed consents indicating consent that M.L.S. adopt the Children. In February 2006, M.L.S. filed a petition to adopt A.S., D.S., and C.S. She later amended her petition to include J.S.

After meeting to discuss the adoption plan for the Children, MCDCS consented to the adoption of A.S., D.S., and C.S. by M.L.S., but J.S. was not eligible for adoption at that time. An adoption hearing was set, but before the hearing was held, MCDCS received a report alleging that M.L.S.'s three adopted children were inappropriately touching the Children and two other minors, a niece and nephew of M.L.S. DCS Ex. 1. M.L.S.'s niece disclosed that Da.S. had engaged in oral and vaginal intercourse with her at M.L.S.'s home and in the bushes at a church yard. M.L.S.'s nephew disclosed that the two adopted daughters had fondled his genitals at M.L.S.'s home.

In response, the next day MCDCS removed the Children and placed them with V.S. V.S. shares a home with her adult daughter, L.S., and L.S.'s teenage daughter. L.S. filed a petition to adopt A.S., C.S., and J.S., and V.S. filed a petition to adopt D.S. Although MCDCS had signed consents for M.L.S. to adopt the Children, MCDCS subsequently consented to L.S. adopting A.S., C.S., and J.S. and to V.S. adopting D.S.

Before the adoption proceedings concluded, a petition was filed in Marion County Juvenile Court alleging Da.S. to be delinquent for committing three counts of child molesting. These counts resulted in the juvenile court entering a not true finding because the judge did not find M.L.S.'s niece to be credible.

Meanwhile, MCDCS conducted a bonding assessment to determine M.L.S.'s, V.S.'s, and L.S.'s level of bonding with the Children. M.L.S.'s scores on the Adult Adolescent Parenting Inventory (AAPI–2) given by the bonding assessor were slightly higher than L.S.'s and V.S.'s scores.

---

1. M.L.S. also goes by a nickname that is a derivative of her middle name and starts with the same initial and was occasionally referred to by this nickname during the adoption proceedings, but we will refer to her throughout as "M.L.S." Additionally, although M.L.S. and biological mother have the same last name, they are not related.

In probate court, the Honorable Charles J. Deiter presided over the adoption proceedings involving the Children. The probate court permitted MCDCS to participate as a party over M.L.S.'s objection. As a result of the numerous and varied consents the biological parents and MCDCS executed, the probate court ordered the parties to brief and argue the issue of the validity and effect of the consents. As described in further detail below, each of the biological parents signed separate consents allowing for M.L.S. to adopt the Children and then signed consents allowing for either V.S. or L.S. to adopt one of the Children.[2] The probate court issued an order ruling that both the M.L.S. petition and the V.S./L.S. petition were supported by the necessary parental consents.

After this ruling, the court held several evidentiary hearings at which M.L.S., L.S., V.S., employees of MCDCS, the investigator assigned to Da.S.'s case, and several other individuals testified. Much of the testimony focused on allegations of incidents that occurred in M.L.S.'s home. C.S.'s therapist testified that C.S. reported to her that Da.S. had touched him in a private area. Tr. Vol. III p. 100. When C.S. first came to live with V.S. and L.S. he was acting out sexually: displaying his genitals at school, *id.* at 103; "humping" the laps of adults, Tr. Vol. V p. 106; "humping" the air because "[Da.S.] liked for him to do that," *id.* at 105, and rubbing Vaseline in between the cheeks of his buttocks because "[Da.S.] likes for me to do that," *id.* A.S. reported that M.L.S.'s two adopted daughters would force M.L.S.'s nephew to do sexual things to herself and to D.S. Tr. Vol. IV p. 63–64. A.S. also reported to the bonding assessor that

M.L.S. used physical discipline, with her adopted daughters holding down the child being disciplined while M.L.S. would spank them with her hand, a belt, a paddle, or an extension cord. Tr. Vol. III p. 123.

In contrast, testimony revealed that the Children appeared happy and stable in the V.S./L.S. home. Tr. Vol. IV p. 89. V.S. and L.S. are both experienced with foster children and have the resources and ability to raise the Children. The MCDCS employees at a meeting to discuss the MCDCS recommendation unanimously voted in favor of L.S. and V.S. to adopt the Children. *Id.* at 111. V.S. and L.S. allowed the Children to see their biological family on an informal, supervised basis. V.S. testified that the Children reacted positively to spending time with their biological mother. Tr. Vol. III p. 86.

M.L.S. requested that the probate court issue specific findings of fact and conclusions of law. The court took the matter under advisement on March 27, 2008, and gave the parties until April 30 to submit proposed findings and any additional evidence regarding the outcome of the Da.S. case. Both proposed findings and additional evidence, which showed that the case against Da.S. was closed after a "not true" finding, were submitted.

Sadly, on November 12, 2008, Judge Deiter passed away. He died without issuing a final ruling. On December 22, 2008, the Honorable Tonya Walton Pratt, after having reviewed the evidence and arguments presented, issued a final adoption decree granting V.S.'s petition to adopt D.S. and L.S.'s petition to adopt A.S., C.S., and J.S. M.L.S. now appeals.

---

**2.** As discussed in further detail below, there are exceptions to this statement. For example, biological mother signed a consent form for M.L.S. to adopt J.S. *after* signing a con-

sent for L.S. to adopt J.S. Also, A.S.'s father did not sign a consent form for either petitioner because his parental rights had been terminated in 2003.

## Discussion and Decision[3]

On appeal, M.L.S. raises a number of issues, which we consolidate and reorder into three: (1) whether the probate court erred by issuing an adoption decree when the previous probate court judge had heard all the evidence and argument in the case but died before issuing a ruling; (2) whether the probate court erred by considering a set of consents signed by the biological parents and the MCDCS allowing L.S. and V.S. to adopt which were executed after the biological parents and the MCDCS had signed never-withdrawn consents allowing M.L.S. to adopt; and (3) whether the probate court's findings of fact and conclusions of law were adequate to support the judgment.

### I. Authority of Successor Judge

■ M.L.S. argues that the probate court erred by issuing an adoption decree when the previous probate court judge heard all the evidence and died before issuing a final ruling. Indiana Trial Rule 63 governs the procedure for situations in which a judge becomes disabled or unavailable. Trial Rule 63(A) provides as follows:

> The judge who presides at the trial of a cause or a hearing at which evidence is received shall, if available, hear motions and make all decisions and rulings required to be made by the court relating to the evidence and the conduct of the trial or hearing after the trial or hearing

is concluded. If the judge before whom the trial or hearing was held is not available by reason of death, sickness, absence or unwillingness to act, then any other judge regularly sitting in the judicial circuit or assigned to the cause may perform any of the duties to be performed by the court *after the verdict is returned or the findings or decision of the court is filed;* but if he is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial or new hearing, in whole or in part. The unavailability of any such trial or hearing judge shall be determined and shown by a court order made by the successor judge at any time.

(Emphasis added.) The general rule in a case where a trial judge dies or resigns before making findings or ruling on the evidence presented is that

> [a] party to an action is entitled to a determination of the issues by the jury or judge that heard the evidence, and where a case is tried by the judge, and the issues remain undetermined at the death, resignation, or expiration of the term of such judge, his successor cannot decide, or make findings in the case, without a trial de novo.

*Wainwright v. P.H. & F.M. Roots Co.,* 176 Ind. 682, 97 N.E. 8, 14 (1912); *see also*

---

3. M.L.S. contends that the trial court erroneously allowed MCDCS to participate as a party. M.L.S. objected at the hearings to MCDCS participation. Tr. Vol. III p. 53. According to M.L.S., there is no statutory authority authorizing a county DCS to have party status. Further, M.L.S. argues that MCDCS has no interest in this case after giving consent. But M.L.S.'s arguments overlook the fact that MCDCS was the Children's guardian at the time of the proceedings and was therefore entitled to notice of the pending adoption *and* was responsible for the children's care until the children were finally placed. *See In*

re Infant Girl W., 845 N.E.2d 229, 238 (Ind. Ct.App.2006), *trans. denied.* In the *Infant Girl W.* case, we held that a county Office of Family and Children (the former name of the Department of Child Services) had standing to appeal from an adoption decree because "OFC has been heavily involved in M.A.H.'s adoption proceeding at every key juncture, *as it should have been,* given that it was M.A.H.'s legal guardian." *Id.* (emphasis added). We conclude that MCDCS does have standing to participate as a party at trial in this case and is a real party in interest.

*Farner v. Farner,* 480 N.E.2d 251, 257 (Ind.Ct.App.1985). However, an appellant waives any claims in regard to a judge's authority to rule on a case by failing to object to the trial court. *Tapia v. State,* 753 N.E.2d 581, 588 (Ind.2001); *Floyd v. State,* 650 N.E.2d 28, 32 (Ind.1994) ("[I]t has been the long-standing policy of this court to view the authority of the officer appointed to try a case not as affecting the jurisdiction of the court. Therefore, the failure of a party to object at trial to the authority of a court officer to enter a final appealable order waives the issue for appeal.").

Here, Judge Deiter presided over the evidentiary hearings and took the adoption matter under advisement after the final evidentiary hearing on March 27, 2008. He gave the parties until April 30, 2008, to submit evidence regarding the outcome of Da.S.'s juvenile case and any proposed findings of fact and conclusions of law. Both evidence regarding the juvenile case and proposed findings of fact and conclusions of law were submitted. After that, Judge Deiter became ill and passed away several months later on November 12, 2008, without issuing a final ruling. On December 22, 2008, Judge Walton Pratt issued a final adoption decree, after she had listened to the record of the proceed-

ings and reviewed the evidence presented. Appellant's App. p. 8. On January 21, 2009, M.L.S. filed a notice of appeal.

We find no indication in the record on appeal that M.L.S. objected to the authority of Judge Walton Pratt to issue the final adoption decree.[4] M.L.S. did not submit a motion under Indiana Trial Rule 53.2, which provides for the transfer of the case to a special judge when a cause has been under advisement for ninety days without a ruling. Nor did M.L.S. otherwise ask for a new trial after Judge Deiter's death.[5] Instead, M.L.S. sat back and waited without taking action until December. When the December judgment turned out to be unfavorable, she then appealed without having ever challenged the authority of the judge in the probate court to issue a final ruling. Because M.L.S. failed to demonstrate that she made an objection on this ground to the probate court, we conclude based on the circumstances in this case that this issue is waived on appeal.[6] *See Garage Doors of Indianapolis, Inc. v. Morton,* 682 N.E.2d 1296, 1300 (Ind.Ct. App.1997), *trans. denied.*

## II. Subsequent Consents

Next, M.L.S. contends that Indiana adoption law does not recognize subsequent consents to adopt children unless

---

**4.** Although the CCS provided in the appendix reveals that a motion for clarification was filed on the same day as the notice of appeal and that the trial court approved an order on the motion for clarification on January 29, 2009, Appellant's App. p. 6–7, these documents are not before us in the record on appeal and, as a result, we do not know the basis for the motion for clarification and cannot say that it contains a post-judgment challenge to Judge Walton Pratt's authority.

**5.** MCDCS states, without citation to the record, that M.L.S. was aware of Judge Deiter's illness and death. We do not know if this is true, but it is apparent that the case was taken under advisement in March 2008 and M.L.S. took no action, other than submitting evi-

dence from the juvenile case and proposed findings of fact and conclusions of law, until after the judgment was entered in December 2008.

**6.** M.L.S. alleges in her brief that her counsel was never served with Judge Walton Pratt's ruling. Appellant's Br. p. 11 n. 1. M.L.S. states that counsel learned of the final order when she received an email containing an order from the juvenile court closing a related CHINS case due to the adoption being finalized. But M.L.S. makes no fundamental error argument in this regard, and it was incumbent on her to make an objection to the trial court or risk waiver on appeal.

the previously issued consents have been withdrawn. Thus, she argues that, since she received the initial consents to adopt the Children and they were not withdrawn, only she may adopt the Children.

We now turn to the consents themselves. First, we examine the parental consents, one child at a time.[7] As for A.S., biological mother signed a consent form indicating that she consented to the adoption of A.S. by M.L.S. Appellant's App. p. 68. Biological mother later signed a subsequent consent form that indicated that she consented to the adoption of A.S. by L.S. *Id.* at 72. The probate court terminated the parent-child relationship between A.S. and her biological father, K.B., on September 3, 2003. *Id.* at 73–74.

As for D.S., biological mother and her biological father, B.S., each signed a separate consent form that indicated that they consented to the adoption of D.S. by M.L.S. *Id.* at 75 (biological mother's consent), 79 (biological father's consent). Biological mother later signed another consent form that indicated that she consented to the adoption of D.S. by L.S. *Id.* at 83. Biological mother later signed yet another consent form indicating that she consented to the adoption of D.S. by V.S. *Id.* at 84. Biological father signed a subsequent consent form indicating that he consented to the adoption of D.S. by V.S. *Id.* at 85.

As for C.S., biological mother signed a consent form that indicated that she consented to the adoption of C.S. by M.L.S. *Id.* at 86. Biological mother later signed a consent indicating that she consented to the adoption of C.S. by L.S. *Id.* at 94. B.S., who is also C.S.'s biological father in addition to D.S.'s biological father, signed a consent form that indicated that he consented to the adoption of C.S. by a person or persons whose names are not known to him. *Id.* at 90. He later signed another consent form indicating that he consented to the adoption of C.S. by L.S. *Id.* at 95.

As for J.S., biological mother, in contrast to the order of consents for the other children, first signed a consent form indicating that she consented to the adoption of J.S. by L.S. *Id.* at 107. Biological mother then signed a consent indicating that she consented to the adoption of J.S. by M.L.S. *Id.* at 96. H.S., the biological father of J.S., signed a first consent indicating that he consented to the adoption of J.S. by M.L.S. *Id.* at 103. Biological father later signed a consent indicating that he consented to the adoption of J.S. by L.S. *Id.* at 108. All of the aforementioned consents were filed with the court. Counsel stipulated that none of the consents for any of the Children were ever withdrawn. Tr. Vol. I p. 10.

Second, we examine the MCDCS consents. The only MCDCS consent form included in the record on appeal is a consent as to J.S., which reads as follows, "Taren Duncan, the undersigned, being the County Office of Family and Children or licensed child placing agency having lawful custody of the child ... hereby consents to the adoption of [J.S.] born March 7, 2006, by [L.S.] or by a person or persons whose names are not known to me." Appellant's App. p. 112. Although the other MCDCS consents are not included in the record on appeal, the parties discussed the MCDCS consents at hearings before the probate court. Apparent-

---

7. We note that many of the consents executed by the biological parents indicated that the parent consented to adoption of the child by one of the petitioners "or by a person or persons whose names are not known to me." In a few of the parental consents, a line was drawn through the "or by a person or persons whose names are not known to me" language. This does not affect our decision.

ly, MCDCS signed consents for M.L.S. to adopt A.S., D.S., and C.S. MCDCS subsequently filed another round of consents for V.S. to adopt D.S. and for L.S. to adopt A.S. and C.S. Tr. Vol. I p. 18. The parties stipulated that no court order has authorized MCDCS to withdraw any consent. *Id.* at 19.

On appeal, M.L.S. argues that if the first consent is not withdrawn by a court of law, then it alone remains in effect and all subsequent consents are void. As a result, M.L.S. argues that she alone holds the only valid and necessary consents (those of biological mother, biological father, *and* the MCDCS) to adopt A.S., D.S., and C.S. because she has the first-signed consents of biological mother, the various biological fathers (with the exception of A.S.'s father, whose parental rights have been terminated), and MCDCS. M.L.S. concedes that, pursuant to her argument, she does not have all the necessary consents as to J.S. because she holds a subsequently signed consent from biological mother.

■■ To answer this question, we must now turn to the statutes governing adoption. The adoption statutes create a proceeding unknown at common law. *In re B.W.*, 908 N.E.2d 586, 592 (Ind.2009). We must strictly construe the Adoption Code in favor of the rights of biological parents. *Id.* But we are also mindful that "careful administration of the statute serves purposes beyond protecting the rights of natural parents to be with their children. It also serves to protect the children and to shield all involved parties from unnecessary instability and uncertainty." *Adoptive Parents of M.L.V. v. Wilkens*, 598 N.E.2d 1054, 1056 (Ind.1992). Indeed, the primary concern in an adoption proceeding is the best interest of the child. *Id.* at 1058; *see also Matter of Adoption of Hewitt*, 396 N.E.2d 938, 942 (Ind.Ct.App.1979) ("The trial judge must recognize there are three parties whose interests and feelings are involved in the adoption process and all must be treated fairly. That judge must balance the interest of the natural parents and their sacred relationship to their child against the hope, expectation, reliances, and desires of the adoptive parents all against the best interest of the child which, after all, rules supreme.").

Before the court may grant a petition to adopt a child, certain consents may be required. Unless the Adoption Code provides otherwise, a petition to adopt a child less than eighteen years old may be granted only if the mother of a child born out of wedlock, the father of a child whose paternity has been established,[8] and the county Department of Child Services that has lawful custody of the child whose adoption is being sought, among other individuals and entities, have executed written consent to the adoption. Ind.Code § 31–19–9–1(a)(2), (3).[9] The consent may be executed

---

8. Although it is unclear whether and how paternity was established for D.S.'s, C.S.'s, and J.S.'s fathers, the parties proceeded as though the fathers' consents were required, and we will do the same.

9. Under some circumstances, a consent initially required under Indiana Code § 31–19–9–1 may not be required after all. For example, if the parents have been adjudged to have abandoned or deserted the child for at least six months immediately preceding the date of the filing of the adoption petition, if the child has been in the custody of someone besides the parents for at least one year when the parent fails without justifiable cause to communicate significantly with the child though able to do so or knowingly fails to provide for the child when able to do so as required by law or judicial decree, if the biological father has failed to establish paternity pursuant to the statute, or if the parent-child relationship has been terminated under Indiana Code article 31–35, then the parent's consent is no longer required. Ind.Code § 31–19–9–8. Also, if the legal guardian or custodian of the person to be adopted has failed to consent to

any time after the child's birth in the presence of the court, a notary, or an authorized agent of the department, a county office of family and children, or a licensed child placing agency.[10] Ind.Code § 31–19–9–2. A consent to adoption that does not identify a specific petitioner or petitioners for adoption, also called a "blanket" or general consent, is valid if the consent contains a statement, by the person consenting to adoption, that said person voluntarily executed the consent to adoption without disclosure of the name or other identification of the petitioner for adoption. Ind.Code § 31–19–9–3(a); *see also Rhodes v. Shirley*, 234 Ind. 587, 129 N.E.2d 60, 62 (1955) (concluding that blanket consents are permissible for public adoption); *Johnson v. Cupp*, 149 Ind.App. 611, 274 N.E.2d 411, 416 (1971) (concluding that blanket consents are permissible for private adoption).

■ However, a party who has previously executed a consent to adoption can withdraw the consent by filing a motion with the court to withdraw consent. Ind. Code § 31–19–10–1(c). But there are limits on a party's ability to withdraw a consent to adoption:

(a) A consent to adoption may be withdrawn not later than thirty (30) days after consent to adoption is signed if:

(1) the court finds, after notice and opportunity to be heard afforded to the petitioner for adoption, that the person seeking the withdrawal is act-

ing in the best interest of the person sought to be adopted; and

(2) the court orders the withdrawal.

(b) A consent to adoption may not be withdrawn after:

(1) thirty (30) days after the consent to adoption is signed. . . .

Ind.Code § 31–19–10–3. A parent seeking to withdraw consent cannot arbitrarily revoke but must instead specify precisely why it is· in the child's best interest to permit her to withdraw her consent. *Bell v. A.R.H.*, 654 N.E.2d 29, 34 (Ind.Ct.App. 1995).

Additionally, the Adoption Code was recently amended to provide a substitution procedure. Ind.Code § 31–19–2–2(c) (amended by P.L. 146–2007, eff. July 1, 2007). A petitioner seeking adoption may be substituted by a subsequent petitioner, through amendment to the original petition or the filing of a second petition, if the original petitioner decides not to adopt the child. *Id.* In such a situation, no additional consent is needed from the biological parents provided that the original consent allows for the substitution. I.C. § 31–19–9–3. The biological parent can also execute a subsequent consent to the substitution. *Id.*

After all the consents and other required documents have been filed and all the evidence has been presented, when the court finds, among other things, that the adoption requested is in the best interest of the child and proper consent, if consent

---

the adoption for reasons found by the court not to be in the best interest of the child, then the consent of the guardian or custodian is not required. I.C. § 31–19–9–8(a)(10). On appeal, MCDCS makes an argument in defense of the adoption decree that parental consents were not required in this case. But the parties proceeded below as though parental consents were required, and in light of our conclusion that the subsequent consents are valid, we need not reach this question.

**10.** While the Adoption Code provides a procedure whereby a father can consent to adoption before the child is born, the child's mother may not execute a consent to adoption before the birth of the child. Ind.Code § 31–19–9–2(b); *see also In re Adoption of N.J.G.*, 891 N.E.2d 60, 65 (Ind.Ct.App.2008).

is necessary, has been given, the court shall grant the petition for adoption and enter an adoption decree. Ind.Code § 31–19–11–1.

With this statutory framework and background in mind, we now turn to the merits of M.L.S.'s arguments.[11] M.L.S. contends, without citation to authority or further explanation, that "if the first consent is not withdrawn by a court of law, then it remains in effect and all subsequent consents are void." Appellant's Br. p. 16. We disagree. We can find no basis in the Adoption Code for holding that all subsequent consents are void. The Adoption Code says nothing that indicates a limitation on the ability to file additional consents, while the Code limits the ability to withdraw a consent or to substitute a petitioner.

Nor does public policy dictate a contrary result. Allowing competing petitions and subsequent consents gives a probate court a choice between two families to determine if placement with one of them is in the best interest of the child, avoids a "race" to obtain a parental consent, and allows biological parents whose rights have not yet been terminated and a county DCS to address changing circumstances. As a result, we conclude that parties whose consent is required for an adoption to be granted may execute subsequent consents.

In this case, all the parties proceeded as though the V.S./L.S. petitions were competing with, rather than substituting for, the M.L.S. petition. In fact, biological mother signed her consent for M.L.S. to adopt J.S. *after* she had signed a consent for L.S. to adopt him. Nor did the parties behave as though the biological parents or MCDCS were withdrawing their consent for M.L.S. to adopt the children. The biological parents never gave any indication that they no longer desired to give the Children up for adoption or that they no longer consented to have M.L.S. adopt the Children. The parties stipulated at trial that there had been no court order authorizing the withdrawal of either a parental consent or an MCDCS consent. Tr. Vol. I p. 17, 19. Such a court order would be required for a consent to be withdrawn. I.C. § 31–19–10–3. Instead, the biological parents and MCDCS signed subsequent consents. This was permissible, and the limits on withdrawal and substitution do not apply.

There was no withdrawal or substitution here. Instead, the biological parents and MCDCS executed subsequent consents allowing L.S. and V.S. to adopt the Children. As a result, the V.S. and L.S. petitions were supported by the necessary consents.

### III. Adequacy of Adoption Decree

■ Finally, M.L.S. challenges the adoption decree itself. Specifically, M.L.S. argues that the probate court erroneously adopted the cross-petitioners' proposed findings verbatim and that the probate court erroneously found that the criminal matter involving M.L.S.'s son was still open at the time of the decree. M.L.S. also argues that the evidence is insufficient to support the trial court's ruling that granting the cross-petitioners' adoption petition is in the best interest of the Children.

---

11. M.L.S. argues that the act of filling in the name of a specific petitioner for adoption has the effect of striking the "or by a person or persons whose names are not known to me" language, thereby demonstrating specific consent rather than general consent, regardless of whether or not the latter language is actu-
ally stricken on the form. We need not reach this issue because we conclude that subsequent consents do not void the original consents and, as a result, the V.S./L.S. petitions in this case were supported by the necessary consents.

When we review a probate court's ruling in an adoption case, we will not disturb the ruling unless the evidence leads to only one conclusion and the probate court reached an opposite conclusion. *In re Adoption of H.N.P.G.*, 878 N.E.2d 900, 903 (Ind.Ct.App.2008), *trans. denied.* "We will not reweigh the evidence but instead will examine the evidence most favorable to the [probate] court's decision together with reasonable inferences drawn therefrom to determine whether sufficient evidence exists to sustain the decision." *Id.* (quoting *In re Adoption of M.A.S.*, 815 N.E.2d 216, 218–19 (Ind.Ct.App.2004)). The appellant bears the burden of overcoming the presumption that the probate court's decision is correct. *Id.* Additionally, the probate court, at a party's request, may enter findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A). In such a case, we employ a two-tiered standard of review: we must determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* (citing *In re Adoption of T.W.*, 859 N.E.2d 1215, 1217 (Ind.Ct.App.2006)). "We will not set aside the findings or the judgment unless they are clearly erroneous." *Id.* Findings of fact are clearly erroneous if the record is devoid of any evidence or reasonable inferences to support them, while a judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those findings. *Id.*

While a trial court is discouraged from adopting a party's proposed findings verbatim, this practice is not prohibited. *Parks v. Delaware County Dep't of Child Servs.*, 862 N.E.2d 1275, 1278 (Ind.Ct.App.2007) (citing *Prowell v. State*, 741 N.E.2d 704, 708–09 (Ind.2001)). The trial court is ultimately responsible for the correctness of the findings. *Id.* As such,

adoption of the V.S./L.S. findings was not in and of itself improper.

More specifically, M.L.S. takes issue with the finding's characterization of the Da.S. matter as a "criminal case" that remains open. As to this case being a criminal case, it is true that the child molesting counts were filed in delinquency court and not in adult criminal court, and therefore the matter was not a "criminal case" but a "juvenile delinquency matter." However, it is clear that the court recognized this when, in another part of its order, it set forth that the case was filed in Marion County Juvenile Court.

As to the characterization of the case as pending, as conceded by MCDCS in its brief, M.L.S. is correct that the probate court erroneously found that the molestation accusations against her son were still pending at the time of the ruling. Before the probate court entered its order, M.L.S. presented evidence that the juvenile court determined that the State did not prove its case against Da.S. beyond a reasonable doubt and therefore entered a not true finding for all three counts of child molesting. Appellant's App. p. 43–46. As a result, the probate court erroneously found that the case against Da.S. remained open at the time of the ruling.

M.L.S. argues that this error justifies a new trial because L.S., V.S., and MCDCS based their case on allegations that a child molester was living in M.L.S.'s home and the probate court's omission of the critical evidence regarding the case closure undermines confidence in the ruling. But an examination of the judgment reveals that, even without this particular finding, the evidence supports the judgment.

Although Da.S. was acquitted of the child molesting allegations against M.L.S.'s niece, the evidence revealed other disturbing conduct in M.L.S.'s home. C.S. reported to his therapist that Da.S. had

touched him in a private area. Tr. Vol. III p. 100. And when C.S. first came to live with V.S. and L.S. he was acting out sexually: displaying his genitals at school, *id.* at 103; "humping" the laps of adults, Tr. Vol. V p. 106; "humping" the air because "[Da.S.] liked for him to do that," *id.* at 105, and rubbing Vaseline in between the cheeks of his buttocks because "[Da.S.] likes for me to do that," *id.*

The Children reported other disturbing accounts involving M.L.S.'s adopted children. A.S. reported that M.L.S.'s two adopted daughters would force M.L.S.'s nephew to do sexual things to herself and to D.S. Tr. Vol. IV p. 63–64. These matters were under investigation at the time of trial. Further, A.S. reported to the bonding assessor that M.L.S. used physical discipline, with her adopted daughters holding down the child being disciplined while M.L.S. would spank them with her hand, a belt, a paddle, or an extension cord. Tr. Vol. III p. 123.

Also, M.L.S. would not let the Children see their biological family. The bonding assessor testified that the relationships between biological parents and their children play an important role in healthy development. *Id.* at 121. She recommended in her report that the Children be allowed to continue to see their biological family. And V.S. testified that the Children reacted positively to spending time with their biological mother. *Id.* at 86. In light of all this evidence, we cannot say that the probate court clearly erred by denying M.L.S.'s petition to adopt.

Further, the evidence supports that it was in the best interest of the Children to be adopted by V.S. and L.S. The MCDCS employees at the meeting to discuss the MCDCS recommendation unanimously voted in favor of L.S. and V.S. to adopt the Children. Tr. Vol. IV p. 111. V.S. and L.S. are both experienced with foster children and have the resources and ability to raise the Children, and M.L.S. does not raise any challenge in regard to the evidence of V.S.'s and L.S.'s ability. The trial court found that since the Children began living with L.S. and V.S., C.S.'s sexually inappropriate acting out has diminished. All the Children appear happy and stable in the V.S./L.S. home. *Id.* at 89. V.S. and L.S. allow the Children to see their biological family on an informal, supervised basis, and the Children respond positively to these visits. In light of this evidence, we cannot say that the probate court clearly erred by granting the V.S./L.S. petition to adopt.

Nevertheless, M.L.S. challenges the adoption decree on several additional grounds. She argues that granting the V.S./L.S. petition splits up the sibling group and creates anomalous inheritance relationships. But V.S. and L.S. share a home, so the siblings would continue to live together even though V.S. is one of the Children and L.S. is adopting the other three. The bonding assessor testified that even if V.S. and L.S. were to live separately in the future, the sibling bond could be maintained through frequent visits. Tr. Vol. III p. 124. We cannot say that the adoption decree was erroneous in this regard. *See In re Adoption of L.M.R.*, 884 N.E.2d 931, 938 (Ind.Ct.App.2008) (refuting adoption petitioners' argument that adoption by competing petitioner would split the sibling group because petitioner competing to adopt only one of the children offered to continue regular visits with the child's siblings). As for the possible inheritance issues, V.S. testified at trial that she had made provisions for her family, including D.S. Tr. Vol. III p. 81. And we cannot conclude that the possibility that the Children might inherit differently in the future justifies the denial of adoption to a family that is willing and able to

care for them now. The probate court did not err in this regard.[12]

In conclusion, the court's adoption decree was supported by the evidence and was therefore not clearly erroneous.

Affirmed.

BAILEY, J., and BRADFORD, J., concur.

12. M.L.S. also argues that the MCDCS's actions in removing the Children from M.L.S.'s home after the allegations against Da.S. were reported, rather than ordering home-based services, evidence a lack of concern for the best interest of the Children. We do not understand how this argument relates to the question at hand, that is, whether the Children's best interest is better served by granting the V.S./L.S. petition.

Finally, M.L.S. makes several arguments that constitute requests for us to reweigh the evidence. M.L.S. contends that there is no evidence that her son Da.S. molested anyone and implies that something in V.S.'s and L.S.'s home is responsible for C.S.'s acting out. But there is no evidence of anything untoward occurring in the V.S./L.S. home and there is evidence that Da.S. did behave inappropriately with C.S. This evidence was before the probate court and it is not our role to reweigh the evidence. Also, M.L.S. points out that her own bonding score was better than L.S.'s and V.S.'s bonding scores and argues that V.S.'s low empathy score in the bonding assessment and age of sixty-five are problematic. Again, this evidence was before the probate court, and it is not our position to reweigh. M.L.S. argues that the Children have been given too much say as to their names and their placement. Dr. Mary Papandria testified that children under the age of fifteen or sixteen were not capable of making decisions regarding their placement or name. Tr. Vol. IV p. 155. Even if we assumed that the probate court gave too much weight to the wishes of the Children, we cannot say that all the evidence points to a conclusion opposite the one reached by the court.