## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 06 2016, 9:23 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bryan L. Ciyou
Ciyou & Dixon, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of: L.S., C.S., & W.S., *(Minor Children)* | April 6, 2016 |
| *Children in Need of Services* | Court of Appeals Case No. 79A02-1505-JC-374 |
| and | Appeal from the Tippecanoe Superior Court |
| J.S. *(Father)*, | |
| *Appellant-Respondent,* | The Honorable Faith Graham, Judge |
| v. | The Honorable Tricia Thompson, Magistrate |
| The Indiana Department of Child Services, | Trial Court Cause Nos. 79D03-1412-JC-309 79D03-1412-JC-310 79D03-1412-JC-311 |
| *Appellee-Petitioner.* | |

**Robb, Judge.**

# Case Summary and Issue

J.S. ("Father") appeals the juvenile court's adjudication of his three children, nine-year-old L.S., seven-year-old C.S., and five-year-old W.S. ("Children"), as children in need of services ("CHINS"). Father raises a sole issue on appeal, which we restate as whether the juvenile court's CHINS determination is clearly erroneous. Concluding the juvenile court's CHINS determination is not clearly erroneous, we affirm.

# Facts and Procedural History

Prior to their marriage, Father and S.S. ("Mother") sought counseling and discussed, in part, how they would discipline any children born to them; the pair agreed corporal punishment would be an appropriate method. During the couple's marriage, Mother and Father physically, mentally, and verbally abused one another. At a young age, L.S. displayed odd behavioral issues. When L.S. was two years old, Mother and Father took L.S. to a pediatrician because they feared L.S. suffered from Asperger's Syndrome. The pediatrician did not diagnose L.S. with Asperger's Syndrome, but recommended Mother and Father videotape L.S.'s behavior so the behavior could be assessed by doctors; the pediatrician also recommended Mother and Father take L.S. to see a specialist. Mother and Father did not videotape L.S.'s behavior nor did they take L.S. to see a specialist. Rather, Mother and Father utilized corporal punishment in an

attempt to deter L.S.'s odd behavior. Father's typical methods of discipline included spanking and "control." Transcript at 257. Both parents would spank the Children with a wooden spoon. "Control" meant that Father would "turn things that [were] not discipline issues into discipline issues" in order to teach the Children a lesson. *Id.* at 258. Mother did not feel Father's methods were effective in disciplining the Children.

[3]     Over the next several years, L.S.'s conduct became violent. Described by Father as "terribly disobedient," L.S. would often hit and kick Father, Mother, C.S., and W.S. *Id.* at 85. In one instance, L.S. kicked Mother in the face as Mother attempted to fasten L.S.'s seatbelt. However, Father claimed C.S. and W.S. received the most abuse from L.S. Mother and Father discussed seeking treatment and therapy for L.S., including spiritual counseling to determine whether L.S. was possessed by demons. *Id.* at 85. Ultimately, Mother and Father did not seek any treatment or therapy because they feared if they sought advice from the "wrong professional who disagreed" with their form of corporal punishment then the Children could "end up in the system and even perhaps institutionalized . . . ." *Id.* at 378.

[4]     In November 2014, Father drove L.S. and C.S. to school. At some point, Father turned the radio off, which irritated L.S. who then removed her seatbelt and resisted Father's order to buckle her seatbelt. Thereafter, Father spanked and/or "pinched" L.S. on the leg multiple times. *Id.* at 261. When L.S. continued to resist Father's order, Father stopped the vehicle on the side of the road. L.S. exited the vehicle and began sprinting away from Father. Father

was only able to catch up to L.S. after she tripped and fell. A few days later, Mother took pictures of bruises on L.S.'s leg because Mother felt Father's "abuse had been escalating towards [Mother] and [L.S.]." *Id.* at 285. Mother did not report the incident.

[5] Two weeks later, the family was eating dinner when Father "started a conversation with the [C]hildren about political topics and required that they all remain in their seat" while Father expressed his political views. *Id.* at 251. Frustrated, Mother requested Father change the topic to something more appropriate for the Children, but Father refused. At some point, L.S. became resistant to remaining at the table. Father then ordered L.S. to remain seated and excused C.S. and W.S. from the dinner table. The situation deteriorated and L.S. began running away from Father because Father was going to spank her. Fearful the situation had gotten out of hand, Mother called the Children's maternal grandfather to see if he could pick up C.S. and W.S. "so they did not have to witness" the incident. *Id.* at 256. When the maternal grandfather arrived, L.S. was seated in a chair at the dinner table "pleading, crying, begging to be excused." *Id.* The maternal grandfather and Father engaged in a "very heated" argument. *Id.* Following the exchange, Father removed his belt and strapped L.S. to the chair, which Father claimed had happened before when the Children were being disruptive. Thereafter, the maternal grandfather called the police. After the police arrived, Father removed the belt and excused L.S. from the table.

[6] On December 3, 2014, the Indiana Department of Child Services ("DCS") filed a petition alleging the Children were CHINS. Specifically, the petition alleged Father inappropriately disciplined the Children and abused Mother in front of the Children. On December 9, 2014, the juvenile court held an initial hearing. There, DCS requested to take the Children into custody and to place the Children with Mother at the Children's maternal grandparent's home, which the juvenile court granted. Following the removal and placement, Father had supervised visits with the Children either at his home or in the community. During one visit, L.S. punched Father in the face. Thereafter, Father's supervised visits were suspended due to his resistance to services, having guns in his home without allowing DCS to assure they were secured, and his "very controlling" personality. *Id.* at 182.

[7] On March 24 and March 31, 2015, the juvenile court held a fact-finding hearing. At the fact-finding hearing, Mother claimed the Children witnessed Father's physical, verbal, and mental abuse. In addition, Mother agreed with DCS that the Children were CHINS. Father testified Mother physically and verbally abused him. Father also stated L.S. "definitely needs therapy," but opined L.S.'s issues were not a result of the family trauma. *Id.* at 503. Father did not agree with Mother that the Children were CHINS. Laura Tibbets, a Permanency Worker with DCS, testified that DCS recommended Father complete a comprehensive psychological evaluation because DCS believed Father suffered from severe mental health issues. In addition, Tibbets stated Father was argumentative, controlling, and unable to control his emotions.

[8] On April 10, 2015, the juvenile court issued a CHINS Fact Finding Order, which included its findings of fact and conclusions thereon. Father now appeals.[1] Additional facts will be added as necessary.

# Discussion and Decision

## I. Standard of Review

[9] When reviewing a juvenile court's CHINS determination, we neither reweigh the evidence nor reassess witness credibility. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). We consider only the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.*

[10] Where, as here, the juvenile court enters findings of fact and conclusions sua sponte, we apply a two-tiered standard of review to the issues covered by the findings: (1) we determine whether the evidence supports the findings of fact, and (2) whether the findings support the judgment. *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). "[W]e review the remaining issues under the general judgment standard, under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence." *Id.* (citation and internal quotation marks omitted)." A finding of fact is clearly erroneous if the

---

[1] We note Mother was a party to the juvenile court's order and filed a notice of appeal on May 13, 2015. Thereafter, the State filed a motion to consolidate Mother's and Father's appeals, which we granted. On September 21, Mother filed a pro se motion for an extension of time within which to file her brief. In the motion, Mother stated her prior counsel withdrew from the case and Mother would be proceeding pro se until she attained new counsel. We ordered Mother to file her brief no later than thirty days from October 28, 2015, but Mother failed to do so.

record lacks evidence, or reasonable inferences from the evidence, to support it. *In re Adoption of A.S.*, 912 N.E.2d 840, 851 (Ind. Ct. App. 2009), *trans. denied.* The judgment is clearly erroneous if we are left with a "definite and firm conviction that a mistake has been made." *In re S.L.*, 997 N.E.2d 1114, 1123 (Ind. Ct. App. 2013). We will reverse only upon a showing that the court's decision was clearly erroneous. *In re K.D.*, 962 N.E.2d at 1253.

## II. CHINS Determination

[11] Father contends the juvenile court's judgment adjudicating the Children as CHINS is clearly erroneous. The juvenile court adjudicated the Children as CHINS under Indiana Code section 31-34-1-1, which provides,

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

In other words, the statute requires the State to prove three basic elements: (1) the parent's actions or inactions have seriously endangered the child, (2) the

child's needs are unmet, and (3) the child's needs are unlikely to be met without State intervention. *In re S.D.*, 2 N.E.3d at 1287. "That final element guards against unwarranted State interference in family life, reserving that intrusion for families 'where parents lack the *ability* to provide for their children,' not merely where they 'encounter *difficulty* in meeting a child's needs." *Id.* (emphasis in original) (quoting *Lake Cnty. Div. of Family & Children Servs. v. Charlton*, 631 N.E.2d 526, 528 (Ind. Ct. App. 1994)). Because a CHINS proceeding is a civil proceeding, the State must prove the child is a CHINS by a preponderance of the evidence. *In re K.D.*, 962 N.E.2d at 1253.

[12] Father argues there is no evidence that Mother's and Father's acts of domestic violence have seriously endangered the Children's physical or mental condition. We disagree. Each parent testified the other was physically, mentally, and verbally abusive. Mother claimed Father was very controlling, and as a result, Mother did not feel she could keep the Children safe. Moreover, the record indicates the Children witnessed acts of domestic violence between Mother and Father, and it is well-established acts of domestic violence in the presence of a child can support a juvenile court order adjudicating the child a CHINS. *See In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010).

[13] In addition to Mother's and Father's acts of domestic violence, Mother and Father failed to take appropriate action to address L.S.'s behavioral issues. L.S. first developed behavioral issues at the age of two. In an attempt to diagnose L.S., Mother and Father were told to videotape L.S.'s behavior and take her to see a specialist, which they did not do. Over the next several years, L.S.

became "terribly disobedient" and violent, and as Father testified, C.S. and W.S. suffered the most abuse from L.S. Tr. at 85. Despite L.S.'s conduct, Mother and Father still did not seek treatment and therapy for L.S.[2] Rather, Mother and Father relied on corporal punishment, which escalated to the point where Father caused bruising on L.S.'s leg. We conclude Mother's and Father's failure to appropriately seek treatment and therapy for L.S., coupled with the acts of domestic violence and family trauma within the home, seriously endangered the Children's well-being.

[14] Finally, Father argues there is no evidence that State intervention is necessary. As noted above, Mother and Father were aware of L.S.'s behavioral issues—including abusing C.S. and W.S.—for several years. Father and Mother knew L.S. needed treatment and therapy, but neither parent sought appropriate treatment for L.S. in order to protect L.S., C.S., and W.S. Moreover, Mother testified all three Children are in need of services, stating further,

> [T]he controlling nature of my husband is very suffocating for me and the [C]hildren and I do not see how I could keep them safe emotionally particularly and as individuals with freedom and intelligence and a personhood. I don't see how I could keep them safe at this point without lots of help. And I have a great support system, but I know my husband well. All he does is fight and I will need people behind me to keep my children from that.

[2] Mother testified that, at some point, L.S. was evaluated by Greater Lafayette Area Special Services (G.L.A.S.S.), which provides public education services to disabled children. L.S. did not qualify for the program and neither parent sought any further treatment or therapy.

*Id.* at 250-51. We also note once DCS became involved, Father's supervised visits were ultimately suspended due to his resistance to services, having guns in the home, and his "very controlling" personality. *Id.* at 182. As to Father's personality, Tibbets recommended Father complete a comprehensive psychological evaluation because DCS believed Father suffered from severe mental health issues. We conclude, given the testimony of Father's conduct during these proceedings, the Children's needs are unlikely to be met without court intervention.

Ultimately, and over the course of several years, Mother and Father failed to take appropriate action to remedy their marital discord and L.S.'s behavioral issues. Mother and Father's failures, coupled with the Children witnessing Mother's and Father's acts of domestic violence, have escalated to the extent where the family's physical and mental well-being is seriously endangered, the Children are in need of services, and the Children will not likely receive the necessary services without coercive court intervention. Accordingly, the juvenile court's order adjudicating the Children as CHINS is not clearly erroneous.

# Conclusion

The juvenile court's CHINS determination is not clearly erroneous, and we therefore affirm.

Affirmed.

Barnes, J., and Altice, J., concur.