## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 27 2015, 9:52 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

T. Andrew Perkins
Peterson Waggoner & Perkins, LLP
Rochester, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

Abigail R. Miller
Graduate Law Clerk
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of S.L., a Child

and

A.W., the Child's Mother,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

January 27, 2015

Court of Appeals Cause No. 25A05-1407-JT-309

Appeal from the Fulton Circuit Court

Trial Court Cause No. 25C01-1310-JT-242

The Honorable A. Christopher Lee, Judge

**Robb, Judge.**

# Case Summary and Issue

[1] A.W. ("Mother") appeals the juvenile court's order terminating her parental rights over S.L. Mother raises three issues on appeal, which we consolidate and restate as one: whether the order terminating parental rights is supported by clear and convincing evidence. Concluding there was sufficient evidence to support the juvenile court's decision to terminate Mother's parental rights, we affirm.

# Facts and Procedural History

[2] Mother has four minor children, who ranged from ages two to nine at the time of the termination hearing in April 2014. This appeal concerns only S.L., who was born July 21, 2005.

[3] In 2006, Mother violated her probation and was convicted of aggravated assault in Michigan. As a result, custody of S.L. was granted to S.L.'s maternal grandmother ("Grandmother"), who lived in Indiana. S.L. continued to live with Grandmother for the next three years, and Mother, who lived in the same area, saw S.L. on a weekly basis during that time.

[4] In September 2009, Mother was living in Michigan and gave birth to her third child, K.K. K.K. was born drug positive, and the Michigan Department of Human Services ("DHS") became involved after DHS substantiated suspicions of child neglect. In September 2010, DHS investigated and substantiated reports that Mother's eldest daughter was not regularly attending school and

that the family was homeless. Mother was ordered to participate in a panoply of services, including a parenting assessment, family counseling, and various services meant to address housing stability, domestic violence, substance abuse, and emotional stability.

[5] In July 2010, Grandmother was arrested on charges of dealing in and possession of methamphetamine. The Indiana Department of Child Services ("DCS") removed S.L. from Grandmother's home and filed a petition alleging S.L. was a child in need of services ("CHINS"). A hearing was held on September 10, 2010, at which both Mother and Grandmother admitted that S.L. was a CHINS. Immediately after that hearing, Mother tested positive for a high level of methamphetamine. The trial court issued a dispositional order on September 16, 2010, ordering both Mother and Grandmother to participate in services. Because Mother was already compelled to participate in comprehensive services in Michigan, DCS allowed Mother to comply with the dispositional order through her participation in services provided by DHS.

[6] Grandmother was convicted of possession of methamphetamine and was placed on probation November 9, 2010. DCS returned S.L. to Grandmother's care for a trial home visit on December 3, 2010, but Grandmother tested positive for methamphetamine only days later. S.L. was once again removed from Grandmother's care and placed in foster care.

[7] In the fall of 2010, Mother still had custody of her other two children in Michigan, and she was allowed supervised visitation with S.L. on a weekly

basis. The visits generally went well. However, Mother's visitation with S.L. was sporadic; she would often fail to show up—sometimes without calling to cancel an appointment. Consequently, DCS instated a requirement that Mother call twenty-four hours in advance to confirm her visit. From the fall of 2010 through the fall of 2013, Mother took advantage of approximately one-half of her scheduled supervised visits with S.L.

[8] In June 2011, Mother gave birth to her fourth child, S.K. On November 8, 2011, Grandmother's custody of S.L. was terminated. Indiana and Michigan began the process of obtaining an Interstate Compact for the Placement of the Child ("ICPC"), which requested that Michigan determine whether it would be in S.L.'s best interest to allow him to live with his Mother in Michigan. But the ICPC was discontinued when, on March 19, 2012, DHS substantiated a report that Mother was once again homeless and that an incident of domestic violence had occurred in her children's presence. DHS removed Mother's other three children from her care and filed Michigan's equivalent of a CHINS petition, to which Mother pled no contest on June 27, 2012.

[9] Mother has used illegal substances, including marijuana and methamphetamine, since the age of fifteen. Prior to a visit with S.L. on July 12, 2012, Mother refused to submit to a random drug screen and acknowledged that she would test positive for illegal substances. A month later on August 10, 2012, Mother submitted to a drug screen that was positive for THC. On September 28, 2012, Mother was arrested in Michigan for possession of methamphetamine. She was convicted of that offense, incarcerated until

November 19, 2012, and was still on probation at the time of the termination hearing in April 2014. Mother violated her probation in the spring of 2013 by engaging in a romantic relationship with a convicted felon.

[10] In addition to her issues with substance abuse, Mother has mental health issues. During the pendency of the CHINS proceedings, Mother completed two psychological evaluations; she was diagnosed with bipolar disorder, personality disorder, methamphetamine abuse, episodic partner relational problems, and parent-child relational problems. An evaluation conducted by Dr. Paul Kitchen in March 2012 indicated that Mother was psychologically and emotionally unstable and that Mother lacked any parenting skills or insight.

[11] Michigan held a review hearing on December 12, 2012, at which the court found that Mother had made "no progress" and failed to reduce her barriers to reunification. State's Ex. 5 at 9 ¶ 5. Another review hearing was held on March 6, 2013, at which the court found that Mother made "minimal progress." State's Ex. 5 at 9 ¶ 6. Mother was failing to participate in services with DHS and had not returned to her designated treatment center after she was released from jail. She was living with a friend and did not have adequate housing for her children.

[12] On May 6, 2013, Mother tested positive for marijuana. A review hearing held in Michigan on May 29, 2013 revealed that Mother was still living with a friend and was without stable housing. Mother was not employed and had no source

of income. But Mother was participating in some of the services offered, and the court found that she had made some progress.

[13] Michigan held a review hearing on August 26, 2013, at which the court found that Mother had made some progress. Mother's drug screens were negative since May, and she was participating in parenting classes. However, Mother was not fully engaged in the services offered, and she was still without stable housing. In September 2013, Mother began working full time as a server in a restaurant, which was her first employment since 2007.

[14] Since his removal from Grandmother's care in December 2010, S.L. moved between several foster homes and was having a number of behavioral issues at home and at school. On September 25, 2013, S.L. was removed from foster care and placed with Midwest Center for Youth and Families ("Midwest"), which specializes in dialectical behavior therapy for persons age six to twenty. When S.L. was moved to Midwest, face-to-face visitation was discontinued, and Mother was allowed weekly telephonic visits with S.L. which usually lasted twenty or thirty minutes. S.L. has been diagnosed with mood disorder, attention deficit hyperactivity disorder, and reactive attachment disorder. On October 18, 2013, DCS filed a petition for termination of Mother's parental rights over S.L.

[15] A permanency hearing was held in Michigan on February 5, 2014, at which the court found that Mother had made some progress. However, Mother was not fully participating in services, and she was still without stable housing, which

she had lacked throughout the entirety of the proceedings dating back to 2010. The court found that Mother did not appear to be benefiting from services. The Michigan court directed DHS to file a petition to terminate Mother's parental rights over her three children in Michigan, and that petition was filed on March 14, 2014.

[16] A termination hearing was held on DCS's petition on April 4, 2014. At the time of the hearing, Mother had been employed since September 2013, she claimed to have been drug-free since her last failed drug screen in May 2013, and she had recently acquired appropriate housing as of February 20, 2014. Both the court appointed special advocate ("CASA") and the DCS case manager assigned to S.L. recommended that Mother's parental rights be terminated. Jacquelin Evan, S.L.'s therapist at Midwest, discussed S.L.'s behavioral issues and testified that S.L. requires a great deal of structure and supervision and that anyone tasked with caring for S.L. would require training. Both Evan and the CASA stressed S.L.'s need for permanence.

[17] On June 6, 2014, the juvenile court granted DCS's petition to terminate Mother's parental rights over S.L. Relevant to this appeal, the court concluded the State proved by clear and convincing evidence that there is a reasonable probability that the conditions that resulted in the child's removal and continued placement away from Mother will not be remedied. The court noted that S.L. requires permanency and that "[f]urther disruptions, even if unintended, will have severe consequences for [S.L.]" Appellant's Appendix at

32. Mother now brings this appeal challenging the termination of her parental rights.[1]

# Discussion and Decision

## I. Standard of Review

A decision to terminate parental rights is reviewed with great deference. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). We will neither reweigh evidence nor judge the credibility of witnesses, and we consider only the evidence and reasonable inferences favorable to the judgment. *Id.*

Where, as here, a court issues findings of fact and conclusions pursuant to Indiana Trial Rule 52(A), we apply a two-tiered standard of review: (1) we determine whether the evidence supports the findings of fact and (2) whether the findings support the judgment. *In re Adoption of A.S.*, 912 N.E.2d 840, 851 (Ind. Ct. App. 2009), *trans. denied*. The trial court's findings or judgment will be set aside only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous if the record lacks evidence or reasonable inferences from the evidence to support it. *Id.* The judgment is clearly erroneous if we are left with a "definite and firm conviction that a mistake has been made." *In re S.L.*, 997 N.E.2d 1114, 1123 (Ind. Ct. App. 2013).

---

[1] A termination hearing regarding Mother's three other children was set for April 30, 2014 in Michigan. The result of those proceedings does not appear to be in the record before us.

# II. Termination of Parental Rights

Indiana Code section 31-35-2-4 sets out what must be proven in order to terminate parental rights. Relevant to this case, the statute requires the State to prove, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> . . . .

Ind. Code § 31-35-2-4(b)(2)(B). The State must prove each element by clear and convincing evidence. Ind. Code § 31-34-12-2; *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009). If a juvenile court determines that the allegations required by Indiana Code section 31-35-2-4 are true, then the court will terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

An important consideration in this case is S.L.'s emotional well-being. The testimony indicates that S.L. has special needs. And even if the juvenile court were to deny DCS's petition to terminate, it is clear that S.L. would not have been returned to Mother in the near future. Testimony given by the CASA and S.L.'s therapist accentuated S.L.'s special needs, his need for permanency, and

the dangers of keeping his future in a state of uncertainty. As this court has repeated on numerous occasions, where the child faces a potentially dire situation, the juvenile court "need not wait to terminate the parent-child relationship until the child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired." *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009).

[22] Mother contends there is not sufficient evidence to show a reasonable probability that the conditions that resulted in S.L.'s removal or the reasons for his placement outside her home will not be remedied. Arguing the trial court erred by reaching a contrary conclusion, Mother states the trial court "improperly relied on evidence of [her] past actions . . . and gave inadequate weight to her present circumstances." Appellant's Brief at 4. The trial court must judge a parent's fitness to care for her children at the time of the termination hearing, taking into account evidence of changed conditions and balancing any recent improvements against any negative actions in the past. *See In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). Furthermore, it is within the trial court's discretion to "disregard the efforts Mother made only shortly before termination and to weigh more heavily Mother's history of conduct prior to those efforts." *In re K.T.K.*, 989 N.E.2d 1225, 1234 (Ind. 2013) (citation omitted).

[23] The fact that Mother made improvements in the months leading up to the termination hearing is not disputable. Findings by the court in Michigan indicated "some progress" in the last review hearings prior to DHS's

termination petition. At the time of the termination hearing, Mother had been employed full time for approximately seven months; she had not had a positive drug screen for approximately eleven months; and she had acquired and maintained her own housing for approximately six weeks.

[24] It is important to note for the purposes of our review that the juvenile court did not ignore Mother's improvements; rather, the court acknowledged them in its findings. *See* Appellant's App. at 28. It would seem that the juvenile court considered Mother's long history of unfitness and instability and concluded that the balance fell in favor of termination. We believe the court was within its discretion to do so, especially considering that Mother was receiving services for nearly *four years* without any significant progress. Our decision may have been different had this case not involved such a lengthy delay, *cf. In re E.M.*, 4 N.E.3d at 649 (stating that the evidence in a "close" case may have compelled reversal of a decision to terminate parental rights if the case, which carried on for three and one-half years, had involved a shorter delay), but Mother's relatively short duration of stability, particularly with respect to housing, necessitates deference to the juvenile court's decision, *id.* The reality is that Mother received services for nearly four years without significant progress, and it was not clearly erroneous for the court to conclude there was a reasonable probability that Mother would not remedy her deficiencies in the long-run.

[25] Mother's improvements in the months prior to the termination hearings are commendable, and we hope that she has continued that upward trend since last April. That said, we believe our deferential standard of review requires us to

affirm.[2] In coming to that conclusion, we take notice of our supreme court's insistence on such deference in termination cases; just one year ago the court stated that "[b]ecause a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 639.

# Conclusion

Concluding the juvenile court's decision to terminate Mother's parental rights was not clearly erroneous, we affirm.

Affirmed.

Bailey, J., and Brown, J., concur.

---

[2] Mother's brief raises concerns that the juvenile court improperly considered Grandmother's actions and DCS's decision to discontinue in-person visitation between Mother and S.L. Our own review of the trial court's order does not support Mother's argument on either point.