# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 21 2015, 10:16 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT
S.W. (MOTHER):

Noah T. Williams
Monroe Co. Public Defender
Bloomington, Indiana

ATTORNEY FOR APPELLANT
M.S. (FATHER):

Jeremy M. Noel
Monroe Co. Public Defender
Bloomington, Indiana

ATTORNEYS FOR APPELLEE
THE INDIANA DEPARTMENT OF
CHILD SERVICES:

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Miller
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
MONROE COUNTY CASA:

Holly M. Harvey
Holly Harvey Law, LLC
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:
A.B. and C.S. *(Minor Children)*,
*Children Alleged to be in Need of Services*,

S.W. *(Mother)* and M.S. *(Father)*

*Appellants-Respondents,*

v.

July 21, 2015

Court of Appeals Cause No.
53A01-1408-JC-365

Appeal from the Monroe Circuit Court
The Honorable Stephen Galvin, Judge
Cause Nos: 53C07-1310-JC-524
53C07-1310-JC-525

The Indiana Department of Child Services

and

Monroe County CASA,

*Appellees-Petitioners,*

**Robb, Judge.**

# Case Summary and Issues

On June 30, 2014, the trial court issued a written order finding A.B. and C.S. to be children in need of services ("CHINS"). S.W. ("Mother") and M.S. ("Father") appeal, raising two issues for our review: (1) whether the trial court erred by continuing the case sua sponte and holding a second fact-finding hearing after Mother's request for judgment, and (2) whether the trial court's CHINS determination was clearly erroneous. Addressing only the second issue, which is dispositive, we conclude that the trial court's CHINS determination was clearly erroneous. We reverse.

# Facts and Procedural History

Mother has two children, A.B. and C.S., both of whom live with Mother. A.B.'s biological father is K.B. C.S.'s biological father is M.S. (referred to as "Father"). Prior to the events that led to the trial court's CHINS determination, Mother and Father lived together but were not married.

[3] On September 30, 2013, the Indiana Department of Child Services ("DCS") received a report of possible abuse or neglect of A.B. and C.S. Kristen King, a DCS caseworker, assessed the home but did not find evidence of abuse or neglect. She did, however, note that four-year-old A.B. acted strangely and did not seem to want King to leave. Mother told King that an appointment had been made with A.B.'s pediatrician due to some concerning behavior observed by Mother.

[4] On October 9, 2013, King made a follow-up visit to Mother's home. Mother informed King that she had recognized sexualized behavior exhibited by A.B., which she had discussed with A.B.'s doctor. King spoke with A.B. and held a "good-touch, bad-touch" conversation with her, at which point A.B. disclosed that she had been molested. King, Mother, and the children drove together to a child advocacy center where A.B. participated in a forensic interview and disclosed that she had been molested by Father. Father was arrested as a result of the allegations. He has been charged with child molestation, and a no contact order was issued in his criminal case.

[5] On October 10, 2013, DCS filed a verified petition alleging that both A.B. and C.S. were CHINS based on the alleged molestation and the fact that the children lived in the same home as Father. An initial hearing was held the same day, at which Mother and Father denied the CHINS allegations. The trial court ordered placement of the children with Mother, and she said she was willing to work with DCS.

[6] A fact-finding hearing was conducted on March 13, 2014. During the months leading up to the hearing, Mother had complied with all DCS directives, which included providing therapy for A.B. There had been no contact between A.B. and Father. King testified that Mother was "shock[ed]" to learn that Father molested A.B. Transcript at 22. King said that at that point "[Mother] was willing to do what ever it took to keep her daughter safe." *Id.* Finally, King testified that she had no safety concerns while the children were in Mother's care, and that Mother was doing everything DCS asked of her.

[7] DCS caseworker Maria Ucan also testified at the March 13 hearing. She expressed concern that Mother had a close relationship with Father's mother, M.W. During the pendency of the CHINS case, Mother had spent the night at M.W.'s residence on one occasion. Ucan said she was worried the children and Father may cross paths due to Mother's relationship with M.W. She also noted that Mother's mother pays for her apartment. Mother was unemployed but searching for a job. After Ucan's testimony, the trial court took the matter under advisement.

[8] On April 14, 2014, the trial court entered an order sua sponte continuing the fact-finding hearing and ordering the Monroe County Court Appointed Special Advocate ("CASA") program to present evidence at a second hearing. A second fact-finding hearing was conducted on June 5, 2014.

[9] At the June 5 hearing, the CASA volunteer, Anjanette Raymond, submitted evidence from three witnesses, including herself. Raymond had spent

approximately thirty hours investigating the case. At that time, A.B. was still regularly receiving therapy, and it was Raymond's recommendation that A.B. continue to do so.

[10] Cindy Ooley, a visit supervisor with Family Solutions, testified that she spoke with Mother during a visit between Father and C.S. on March 12, 2014. Ooley testified that when she told Mother she must excuse herself from further involvement because of a conflict of interest, Mother asked her not to tell anyone about the conflict. Mother also told Ooley that she wanted to see Father "because she loved him and that she believed he was innocent." Tr. at 87-88.

[11] CASA Raymond opined that the coercive intervention of the court was needed. She offered several reasons for her opinion: (1) she suspected that Mother was in denial that Father molested A.B.; (2) she was concerned that Mother may discontinue A.B.'s therapy if there was no CHINS finding; (3) Mother did not fully disclose to A.B.'s therapist about threats that A.B. allegedly received during the sexual abuse; (4) Mother relied on her mother for financial support; and (5) Mother was fearful of the court and respected the court's authority.

[12] On June 30, 2014, the trial court issued an order concluding that A.B. and C.S. were CHINS. The trial court's order included the following relevant findings:

Findings of Fact

2.     In October, 2013, the children resided with [Mother] and [Father].

3. On October 9, 2013, [A.B.] was interviewed at "Suzie's Place" [sic] Child Advocacy Center. [A.B.] revealed that she had been repeatedly molested by [Father] . . . which the Court accepts as true . . . .

4. Following [A.B.'s] disclosures, the children were detained from [Father's] care and Petitions alleging that the children are Children in Need of Services were filed.

5. A fact-finding hearing was held on March 13, 2014. DCS caseworker Kristen King testified that she has worked for DCS for 10 months. She investigated the case. She testified that [Mother] was willing to do whatever was necessary to protect her children. Therefore, when the case was initiated, the DCS decided to recommend that the children remain in [Mother's] care. Ms. King further testified that, although she was not the current caseworker, she had no concerns that the children were safe in [Mother's] care.

6. However, DCS caseworker Maria Ucan, the ongoing caseworker, testified that she had safety concerns for the children. She noted that [Mother] continues to maintain a relationship with [Father's] mother, including spending the night at her home. [Mother] lives in an apartment paid for by [Father's] mother. [Mother] has taken no steps to be financially independent from [Father's] mother. Further, [Mother] has made it clear that she does not want DCS involved in her life.

\*\*\*

8. Cindy Ooley was called as a witness by the CASA at the June 5th hearing. Ms. Ooley is a therapist who works for Family Solutions. Family Solutions provides services to [Mother] and the children. Ms. Ooley was asked to supervise a visit between [Father] and [C.S.] on March 12, 2014. [Mother] brought [C.S.] to the visit. When Ms. Ooley realized that she is related to [Mother], she told [Mother] that she would not be able to continue to offer services because of the conflict of interest. [Mother] replied "You haven't told them, have you? Don't tell them." During the conversation, [Mother] stated "I wish I could see [Father]." When Ms. Ooley asked why she wanted to see [Father], [Mother] stated "because I love him and I believe he is innocent."

9. The Court Appointed Special Advocate, Anjanette Raymond, has a B.A. in psychology, an M.A. in counseling, a J.D. from Loyola

University, and a L.L.M. from the University of London. She currently teaches international commercial finance and international conflict resolution at the Kelley School of Business and the Maurer School of Law at Indiana University. Prior to becoming an attorney, Ms. Raymond spent 13 years as a therapist treating adolescent sex offenders. She spent approximately 30 hours investigating this case.

10.     Ms. Raymond notes that, in addition to the molestation, [Father] made threats to [A.B.]. [A.B.] will require ongoing mental health treatment to deal with the trauma of the molestation.

11.     Ms. Raymond asserts that [Mother] is not able to adequately protect the children because she has not come to terms with the fact that [Father] molested her daughter. She notes that [Mother] is cooperative with authority figures, but is in denial. She believes that [Mother] will keep the children safe as long as the coercive intervention of the court continues. The Court accepts this testimony as truthful and accurate.

Conclusions of Law

***

2.     Despite the overwhelming evidence that [A.B.] was repeatedly molested by [Father], it is clear that [Mother] does not believe her daughter. Further, she has acted deceptively in not informing the DCS or the CASA of her opinion. Considering [Mother's] behavior, removal of the children from [Mother's] care in order to ensure their health and safety would be warranted. However, as the CASA testified, [Mother] complies with directives from authority figures. She has demonstrated that she will keep the children safe as long as the threat of removal continues. Clearly, the coercive intervention of the court is necessary to ensure the safety of the children.

3.     [A.B.] will require treatment to deal with the emotional trauma of the molestation. Treatment can only be ensured with the active intervention of the court.

Appellant's Appendix at 112-14. Mother and Father now appeal the trial court's CHINS determination.

# Discussion and Decision

## I. Standard of Review

[13] When reviewing a trial court's CHINS determination, we neither reweigh the evidence nor judge witness credibility. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). We consider only the evidence supporting the trial court's decision and the reasonable inferences to be drawn therefrom. *Id.*

[14] Where, as here, the trial court enters findings of fact and conclusions sua sponte, we apply a two-tiered standard of review: (1) we determine whether the evidence supports the findings of fact and (2) whether the findings support the judgment. *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). A finding of fact is clearly erroneous if the record lacks evidence or reasonable inferences from the evidence to support it. *In re Adoption of A.S.*, 912 N.E.2d 840, 851 (Ind. Ct. App. 2009), *trans. denied*. The judgment is clearly erroneous if we are left with a "definite and firm conviction that a mistake has been made." *In re S.L.*, 997 N.E.2d 1114, 1123 (Ind. Ct. App. 2013). We will reverse only upon a showing that the court's decision was clearly erroneous. *In re K.D.*, 962 N.E.2d at 1253.

## II. CHINS Determination

[15] The trial court adjudicated the children CHINS under Indiana Code section 31-34-1-1, which provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[16] The burden is on DCS to prove by a preponderance of the evidence that a child is a CHINS. *In re L.C.*, 23 N.E.3d 37, 39 (Ind. Ct. App. 2015), *trans. denied*; Ind. Code § 31-34-12-3. "Not every endangered child is a child in need of services, permitting the State's *parens patriae* intrusion into the ordinarily private sphere of the family." *In re S.D.*, 2 N.E.3d at 1287.

[17] Mother contends that the trial court's CHINS adjudication is clearly erroneous, specifically arguing that she did not require the coercive intervention of the court. The portion of the statute requiring the need for the court's coercive intervention "guards against unwarranted State interference in family life, reserving that intrusion for families where parents lack the *ability* to provide for their children, not merely where they encounter *difficulty* in meeting a child's needs." *Id.* (citation and quotation marks omitted) (emphasis in original).

[18] The findings supporting the trial court's determination that court intervention is necessary are Factual Findings 6, 8, 10 and 11 and Conclusions 2 and 3.[1] As for Factual Finding 6, DCS concedes that it is clearly erroneous in its statement that Mother is financially dependent on Father's mother. At the time of the fact-finding hearing, Mother received financial help from *her mother*, and there is no evidence that she has ever received financial support from Father's mother. Thus, the only portion of Factual Finding 6 that could support the trial court's decision was Ucan's concern that the children could have an unsupervised encounter with Father. This concern must be viewed in the proper context, which is that Mother visited Father's mother's residence only once—before a request from DCS not to visit—and that no such encounter between Father and the children occurred during the life of the case.

[19] The remaining findings are all related to A.B.'s need for continued therapy and the need to keep the children safely away from Father. It was the trial court's conclusion that those things could only be provided by Mother with the coercive intervention of the court. We agree with the trial court that A.B.'s safety and emotional well-being are of paramount concern. However, we cannot agree with the court that the evidence supports a conclusion that the coercive intervention of the court is necessary in this case. From the time Mother learned of A.B.'s molestation until the time of the second fact-finding

---

[1] We note that the trial court's Conclusions of Law 2 and 3 contain what are actually factual findings, rather than purely legal conclusions.

hearing, Mother had done all that DCS asked of her, including taking A.B. to therapy and ensuring there was not a single incident of unsupervised contact between Father and the children. CASA Raymond's opinion—and the trial court's conclusion—that Mother would be unable to continue acting in the best interests of the children is not based on Mother's actual conduct; if anything, that conclusion is made in spite of all Mother's actions to the contrary. Rather, the conclusion that court intervention is needed seems to be entirely speculative.

[20] Mother's respect for the trial court's authority cannot be used as support for finding that court intervention is necessary. All rational parents in such a situation are expected to respect a court's authority. It is equally predictable that a parent—especially one who cares for her child—fears the possibility that her child may be taken from her. Mother's view of the court's authority is normal under the circumstances. If respect for the court's authority is sufficient to invoke the need for court intervention, then the statute's requirement would mean nothing at all.

[21] Mother's statement to Ooley appears to be the only cognizable basis for a conclusion that court intervention is necessary in this case. The trial court's Factual Finding 8 recounts the statement in relevant part: "[Mother] stated 'I wish I could see [Father].' When Ms. Ooley asked why she wanted to see [Father], [Mother] stated 'because I love him and I believe he is innocent.'" Appellant's App. at 114. First, we observe that Mother's statement that she wished she could see Father does not question A.B.'s need for therapy, nor did

she say that she wanted *A.B.* to see Father or that she herself *planned* to see him. Moreover, this single statement was made by Mother nearly three months before the June 5 fact-finding hearing. It is the only statement of its kind, and there was no evidence presented at the June 5 hearing that Mother still had not come to grips with A.B.'s allegations or that Mother intended to do anything other than keep her children safe. In light of Mother's demonstrated willingness and ability to care for her children in the manner deemed appropriate by DCS over the course of several months, it is not reasonable to infer from Mother's statement to Ooley that she is incapable of providing for her children without the coercive intervention of the court.

[22] The sexual abuse suffered by A.B.—which we presume to be true for the sake of this appeal—is a serious issue that impacts her safety and well-being, and we admire the trial court's use of caution where a child's safety is at stake. That said, the evidence presented at the fact-finding hearings does not support the conclusion that Mother is unable to care for her children or that court intervention was needed.[2] *See In re S.D.*, 2 N.E.3d at 1287.

---

[2] Although much of our discussion concerns Mother, we are cognizant that Father's actions are at the root of this CHINS case. That said, at the time of the fact finding hearings, Mother was the only parent exercising custody and control over the children, and she was capable of keeping the children safe and away from Father. Father was arrested and charged with child molestation, and his criminal case is still open as of the date of this decision. Father's criminal proceedings include imposition of a no contact order that prohibits Father from engaging in any contact with Mother or A.B., and that no contact order will remain in place after our reversal of the CHINS determination. Consequently, an enduring CHINS finding as to Father would not further the objective of keeping the children safely away from Father. Rather, a continuing CHINS case would serve only as a burden to Mother, who the State failed to show needs the continuing, coercive intervention of the court.

# Conclusion

[23]    Concluding the trial court's CHINS adjudication is clearly erroneous, we reverse.

Reversed.

May, J., and Mathias, J., concur.