## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Sep 18 2015, 8:39 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Cynthia Phillips Smith
Law Office of Cynthia P. Smith
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of: M.R.H. and M.M.E. *(Minor Children)* <br><br> And <br><br> V.L.E. *(Mother)*, <br><br> *Appellant-Respondent,* <br><br> v. <br><br> The Indiana Department of Child Services, <br><br> *Appellee-Petitioner* | September 18, 2015 <br><br> Court of Appeals Case No. 79A04-1502-JT-51 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Honorable Thomas K. Milligan, Senior Judge <br><br> Trial Court Cause Nos. 79D03-1408-JT-35 79D03-1408-JT-36 |

**Robb, Judge.**

# Case Summary and Issue

[1]     V.E. ("Mother") appeals the juvenile court's order terminating her parental rights over M.R.H. and M.M.E. Mother raises one issue on appeal: whether the order terminating parental rights is supported by clear and convincing evidence. Concluding there was sufficient evidence to support the juvenile court's decision to terminate Mother's parental rights, we affirm.

# Facts and Procedural History

[2]     M.R.H. was born on February 16, 2012. M.R.H.'s father executed a paternity affidavit at the time of the birth. Mother subsequently married M.R.H.'s father while he was incarcerated awaiting sentencing for murder.[1] In April 2013, the Department of Child Services ("DCS") received a report that Mother was homeless and living in her van in Lafayette with M.R.H. The report also alleged that Mother was abusing and neglecting M.R.H. DCS initiated an informal adjustment in order to address Mother's housing issues. Shelters which had prior interactions with Mother would not accept her. Although DCS successfully placed Mother with the Salvation Army, Mother was asked to leave because she would not follow the rules, did not properly supervise

---

[1] M.R.H.'s father is presently serving an eighty-year sentence in the Indiana Department of Correction for that murder. He participated in the termination proceedings via a video connection.

M.R.H., and swore at and slapped M.R.H. Thereafter, Mother was unable to obtain stable housing.

[3] On June 5, 2013, DCS filed a Child in Need of Services ("CHINS") petition. M.R.H. was removed from Mother's care and placed with M.R.H.'s maternal grandmother, who already had custody of Mother's first child, a son.[2] The juvenile court declared M.R.H. a CHINS on August 1, 2013. During this time, Mother met C.S. and his girlfriend on an online advertising service and moved in with the couple. The arrangement lasted only a short time, as Mother began a sexual relationship with C.S. and was forced to leave by C.S.'s girlfriend. Mother continued her relationship with C.S. even though she was advised by a DCS service provider that the relationship could jeopardize her reunification with M.R.H. Mother next began living with a man she met online who did not require a deposit or rent in advance. Mother left that home when the man demanded that she engage in sexual activity with him in lieu of rent. Mother moved in with another person she met online, D.M., a nurse who identified with Mother's circumstances and wished to help her. This housing was stable and worked out well for Mother.

---

[2] The grandmother has legal guardianship of the son. He is not at issue in this case.

[4] Mother gave birth to M.M.E. on October 1, 2013.[3]  Because Mother had stable housing and employment, DCS did not immediately remove M.M.E. from Mother's care.  The stability provided by Mother's environment began to decline after M.M.E.'s birth.  C.S. moved in with D.M. and Mother.  Mother's emotional state deteriorated.  She had bouts of anger and depression.  Mother intentionally cut her arms and legs.  Mother suspected that D.M. had engaged in sexual activity with C.S., so Mother, M.M.E., and C.S. left D.M.'s home.

[5] Mother's relationship with C.S. was turbulent.  Mother reported to service providers that C.S. was an abusive, suicidal cocaine abuser.  DCS filed a CHINS petition as to M.M.E. on December 13, 2013.  On January 21, 2014, C.S. demanded that Mother leave their residence, despite the frigid weather.  Mother had no housing and no financial resources.  After Mother refused to work with DCS to form a viable plan for housing, the juvenile court granted DCS's emergency petition to remove M.M.E. from Mother's care and placed the child with her maternal grandmother.

[6] Mother moved into the home of a family who had previously taken her in.  The family was prepared to support Mother so that she could work towards reunification with M.R.H. and M.M.E.  However, Mother was frequently absent from the home because she was staying with C.S.  After a month, the

---

[3] Mother's husband was incarcerated at the time of M.M.E.'s conception.  A DNA test confirmed that J.S. is M.M.E.'s father, although he did not establish legal paternity.  During the termination hearing, J.S. voluntarily relinquished his parental rights.

family asked Mother to leave. Mother stayed with various friends for a number of months. Mother did not stay in contact with her service providers or case workers during this period. In the spring of 2014, Mother began living with A.M., her new boyfriend. A.M. and Mother's relationship was troubled. Mother eventually obtained a protective order against A.M., alleging that he threatened her with a gun. Mother returned to C.S.'s home and stayed there until they broke up a week later. Mother lived with a friend for a short time before moving into an apartment on Morton Street in July 2014.

[7] When DCS became involved with Mother in April 2013, she was unemployed. Mother worked part-time at a pizza restaurant for four months in 2013 until she was fired for theft. Mother also worked at a pancake restaurant for two weeks in July 2014. Service providers noted that Mother was selective regarding the places she wished to apply for employment and showed no initiative to search for a job during her periods of unemployment. When she still had custody of M.M.E., Mother would place her in DCS-funded childcare for up to eleven and one-half hours a day but would not use the time to search for employment.

[8] From the beginning of M.R.H.'s CHINS proceeding, DCS provided a number of services to Mother in order to address her housing, employment, parenting, and mental health issues. Mother often complained that the services that DCS offered her were a waste of her time and that she was better off without the State's intervention. Mother had a hostile, defiant attitude, and she was abusive to service providers. During one incident, a case manager provided transportation for Mother to an appointment. Mother became irate with the

case manager because she would not drop Mother off at the door of the building before parking the car. Mother refused to leave the car, and the case manager called the authorities. During another incident, Mother informed a case worker who was providing Mother with transportation that Mother could find an object in the case worker's car and kill her with it. Another meeting with service providers ended by Mother threatening to kill herself or to kidnap her children. Efforts to address Mother's attitude and behavior were met with resistance. Mother was discharged from at least four service providers for lack of initiative and poor attendance.

[9] During the CHINS proceedings for her daughters, Mother exercised visitation. Mother often displayed frustration with her daughters during visits, particularly with M.R.H. Mother yelled at the children during every visit. She would also grab objects from them and make grunting noises. Mother received education and prompting regarding proper discipline for her children, but her frustration with the girls remained an issue throughout the case. Her service providers felt that they were unable to make progress with Mother in this area because they spent so much of their service time assisting Mother with the almost daily personal crises in her life. One provider observed Mother throwing a pet kitten on the floor and throwing objects at it. M.R.H. copied her Mother's behavior.

[10] Mother was referred to mental health services at the onset of M.R.H.'s CHINS proceedings. Mother was not a willing participant. Mother consistently maintained that she did not have mental health issues. She attended therapy sporadically. Mother was prescribed a mood stabilizer during her pregnancy

with M.M.E. Service providers noticed a marked improvement in Mother's attitude and stability during this time. Mother ceased taking the medication after M.M.E.'s birth without consulting a physician. She did not resume taking that medication. Mother took Adderall to address her Attention-Deficit/Hyperactivity Disorder ("ADHD"), but testing indicated that she did not take it in the prescribed manner. Mother was greatly upset when her insurance no longer paid for her Adderall. After undergoing a psychiatric evaluation in January and February 2014, Mother was diagnosed with Bipolar II Disorder, ADHD, and Borderline Personality Disorder with Antisocial Traits. The evaluator noted that Mother's "personality disorder is marked by a pervasive instability in identity, mood, behavior, and relationships." Exhibit Y at 10.[4] The evaluator found that

> [Mother] tests as being of above average to well above average intelligence. Even with her attention deficits she is capable of quickly learning new information about parenting. However, her personality disorder limits the degree to which she is capable of implementing this information. [Mother] is deeply mistrustful of others, extremely self-serving, and content to live her life in a spontaneous manner with little consideration for the long-term consequences of her behavior for herself and her children.

*Id*. at 11. The evaluator recommended that Mother follow up with service providers to obtain medication to control her mood.

---

[4] Exhibit N contained records from another DCS case. DCS is cautioned to be more careful in the future not to mix case information.

[11] On September 3, 2014, DCS filed its petition to terminate parental rights ("TPR"). A hearing was held on the petition on November 12, 2014. As of that date, Mother had been provided with mental health assessments, including a psychological evaluation, individual therapy, medication management, a parenting assessment, visitation, drug screens, and home-based case management. Mother was pregnant again. Mother had been living at the Morton Street apartment for four months, but her expenses there outstripped her resources. Although she had not been evicted, her landlord was prepared to start eviction proceedings if Mother did not pay the balance due on her November rent that day. Mother had been employed at a restaurant for three months. She had also secured a second, seasonal job. Mother planned to rely on A.M., the putative father of her latest child, for financial assistance, although he had not been a financial resource in the past. She also planned to move in with A.M., who was still subject to a protective order in favor of Mother. Mother was on Medicaid but was not taking any medications for her mood disorder, although she did anticipate renewing her Adderall prescription when able. Mother stated at the hearing that "[b]asically everything that I had going on in my life that was causing me problems is over and I've made sure of that." Transcript at 240.[5]

---

[5] The transcript was transmitted to this court littered with pink sticky notes. Counsel for the parties are cautioned to return the record to the court in the condition it was received.

[12]   During the TPR hearing, the court appointed special advocate ("CASA") for the girls and the DCS case manager rendered their opinions regarding the case as follows. Mother would not remedy her housing and employment issues. Mother demonstrated brief periods of improvement followed by regression into old habits. Mother had not benefitted from the services provided to her during the case because Mother felt they were a waste of her time. Mother would never achieve stability in her life without first addressing her mental health issues. Mother was not currently in therapy or medication management. Mother posed a threat to her children because she had not achieved stability in her relationships or her mental health. Termination of Mother's parental rights was in the best interests of the children because Mother could not provide a stable home and would not be able to do so in the future.

[13]   On January 8, 2015, the juvenile court issued its extensive findings of fact and conclusions thereon. The juvenile court noted that DCS had accurately targeted their services towards helping Mother with the issues that had resulted in the removal of her children. The juvenile court found that those services had ultimately failed and that there was more than a reasonable probability that Mother would be unable to remedy the issues that resulted in the removal of her children. The juvenile court further found that

> [t]he parents have not demonstrated a willingness to make lasting changes from past behaviors or maintain stability in order to care and provide adequately for the children. Continuation of the parent-child relationships poses a threat to the well-being of the children. The children need parents with whom the children can

form a permanent and lasting bond to provide for the children's emotional and psychological as well as physical well-being.

The children's well-being would be threatened by keeping the children in parent-child relationships with parents whose own choices and actions have made them unable to meet the needs of the children.

DCS has a satisfactory plan of adoption for the care and treatment of the children following termination of parental rights. The children can be adopted and an appropriate permanent home has been found for the children and that is to be adopted by the maternal grandmother.

For the foregoing reasons, it is in the best interests of [M.R.H. and M.M.E.] that the parental rights of [Mother and Father] be terminated.

Appendix of Appellant at 23-24.  Mother now appeals.[6]  Additional facts will be added as necessary.

# Discussion and Decision

## I. Standard of Review

[14]     A decision to terminate parental rights is reviewed with great deference.  *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013).  We will neither reweigh

---

[6] Neither father participated in this appeal.

evidence nor judge the credibility of witnesses, and we consider only the evidence and reasonable inferences favorable to the judgment. *Id.*

[15] Where, as here, a court issues findings of fact and conclusions pursuant to Indiana Trial Rule 52(A), we apply a two-tiered standard of review: (1) we determine whether the evidence supports the findings of fact; and (2) whether the findings support the judgment. *In re Adoption of A.S.*, 912 N.E.2d 840, 851 (Ind. Ct. App. 2009), *trans. denied*. The trial court's findings or judgment will be set aside only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous if the record lacks evidence or reasonable inferences from the evidence to support it. *Id.* The judgment is clearly erroneous if we are left with a "definite and firm conviction that a mistake has been made." *In re S.L.*, 997 N.E.2d 1114, 1123 (Ind. Ct. App. 2013).

## II. Termination of Parental Rights

[16] Indiana Code section 31-35-2-4 sets out what must be proven in order to terminate parental rights. Relevant to this case, the statute requires the State to prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

* * *

[and]

(C) that termination is in the best interests of the child[.]

Ind. Code § 31-35-2-4(b)(2)(B)-(C). The State must prove each element by clear and convincing evidence. Ind. Code § 31-34-12-2; *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009). If a juvenile court determines that the allegations required by Indiana Code section 31-35-2-4 are true, then the court will terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

## A. Remedy of Conditions Resulting in Removal

The juvenile court found that there was "more than a reasonable probability that the conditions which resulted in the removal of the children from the Mother's care and placement outside the home will not be remedied." App. of Appellant at 23. It also found that Mother had not "demonstrated a willingness to make lasting changes from past behaviors or maintain stability in order to care and provide adequately for the children." *Id.* Mother does not argue that the juvenile court's factual findings are erroneous. Rather, Mother argues that the juvenile court's conclusions were not supported by clear and convincing evidence.

[18]    M.R.H. and M.M.E. were removed from Mother's care primarily due to her unstable housing. Mother was homeless at the beginning of the case. Due to her behavior, she was unable to access community shelters. Mother demonstrated a lack of willingness to work with service providers to seek out rent-subsidized housing. Instead, Mother drifted from home to home. Her poor choices and behavior rendered it impossible for her to stay in one location for any period of time. At the time of the TPR hearing, Mother had been in a home for four months but was already facing eviction. Her solution was to move in with A.M., with whom she had a volatile relationship. In fact, Mother still had an active protective order against A.M.

[19]    Mother's unemployment was a contributing factor to the instability of her housing. Mother's longest period of employment before DCS initiated its TPR proceeding was four months of part-time work at a pizza restaurant in 2013. Mother lost that job when she was accused of theft. Mother also worked at a pancake house for two weeks in 2014. The record discloses only those two brief periods of employment until Mother began working at another restaurant three months before the termination hearing. During her periods of unemployment, service providers assisted Mother by driving her to businesses and helping her to fill out applications. They found that Mother did not wish to apply at many businesses which could have provided her with work and failed to show any initiative to seek employment.

[20]    Mother's parenting skills were an additional issue throughout the case. Mother could not control her anger and frustration with M.R.H. Mother yelled at

M.R.H. during visitation, grabbed things from her, and made grunting noises at the child. Despite a parenting assessment, education about proper discipline, and supervised visitation, Mother failed to make progress in this area.

[21] Mother also failed to address her mental health issues. Mother has been diagnosed with Bipolar II Disorder, ADHD, and Borderline Personality Disorder with Antisocial Traits. She has been referred to therapy and medication management. Her attendance at therapy was sporadic, and she did not take her medication consistently. At the time of the TPR hearing, Mother was neither in therapy nor taking any medication to control her mood disorder.

[22] Thus, Mother had failed to remedy any of the conditions that resulted in the removal of her children. DCS deployed a panoply of resources to address Mother's issues, but those efforts failed due to Mother's attitude and behavior. Mother was resistant to the help offered her and felt that she was better off on her own. She was at times abusive to those attempting to assist her in reunifying with her children. Most concerning is the fact that Mother does not acknowledge that she has serious mental health issues that have prevented her from achieving stability in her life. It was the opinion of the CASA and the DCS case worker that Mother would never make progress on her issues until she addressed her mental health.

[23] Despite the foregoing evidence to the contrary, Mother argues that there was insufficient evidence to show that she would not remedy the conditions resulting in removal because she had remedied those conditions by the time of

the TPR hearing.  Mother urges us to consider her recent employment, that she had been in the same home for a number of months, and that she "was beginning the process of receiving treatment for her psychological issues."  Brief of Appellant at 10.  Our supreme court has held that

> the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.  We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination.  Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior.

*In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (alteration in original) (internal quotations and citations omitted).  The juvenile court heard the evidence of Mother's recent progress but evidently placed more weight on the patterns of behavior that she exhibited throughout this case.  We will not second-guess the juvenile court's judgment by reweighing the evidence.  *See In re J.C.*, 994 N.E.2d at 283.  Given the substantial evidence supporting it, we cannot say that the juvenile court's conclusion that there was a more than reasonable probability

that Mother would not remedy the conditions that warranted removal of her children is clearly erroneous.[7]

## B. Termination in the Best Interests of the Children

The juvenile court was also required to find that termination of the parental relationship was in the best interests of M.R.H. and M.M.E. Ind. Code § 31-35-2-4(b)(2)(C). The juvenile court was permitted to rely upon much of the same evidence to support its conclusions that there was a reasonable probability that Mother would not remedy the conditions that resulted in removal and that termination was in the best interests of the children. *See Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006) ("A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests."), *trans. denied*.

Mother was unable or unwilling to address her housing, employment, parenting, and mental health issues. It was the opinion of the children's CASA that Mother had failed to make progress in "any area" addressed by the services provided to her and that termination was in the children's best interests. Tr. at

---

[7] The juvenile court was required to find either a reasonable probability that the conditions resulting in removal would not be remedied or that the continuation of the parental relationship threatened the children's well-being. Ind. Code § 31-35-2-4(b)(2)(B). Because we conclude that the evidence supported the juvenile court's disposition as to the first factor, we will not address Mother's arguments on the second factor.

182. The DCS case worker testified at the TPR hearing that the children "deserve permanency," *id.* at 215, and that termination was in their best interests. In addition, the children were doing well with their maternal grandmother. This was powerful evidence that further supported the juvenile court's conclusion that termination was in the best interests of M.R.H. and M.M.E. *See In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (testimony of caseworkers, together with evidence that the conditions resulting in placement outside the home will not be remedied, was sufficient to prove by clear and convincing evidence that termination was in child's best interests), *trans. denied*.

# Conclusion

[26] The juvenile court's conclusions that the probability that the conditions resulting in the children's removal would not be remedied and that termination of the parental relationship was in the children's best interests were supported by clear and convincing evidence. The juvenile court's order terminating Mother's parental rights as to M.R.H. and M.M.E. is affirmed.

[27] Affirmed.

Vaidik, C.J., and Pyle, J., concur.